Judge Berman

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD PESHKIN, On Behalf Of Himself As An Individual, On Behalf Of Spectrum Select L.P. As A Limited Partner, And On Behalf Of All Others Similarly Situated, | ) ) ) ) ) ) Civil Action No. 08 CIV 11183 ) |
| Plaintiff, | ) ) ) |
| v. | ) **JURY TRIAL DEMANDED** ) |
| TREMONT GROUP HOLDINGS, INC., TREMONT PARTNERS, INC., RYE INVESTMENT MANAGEMENT, OPPENHEIMER ACQUISITION CORPORATION, OPPENHEIMERFUNDS, INC., MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, KPMG L.L.P., AND JOHN DOES 1-100 INCLUSIVE, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

RECEIVED
DEC 29 2008
U.S.D.C. S.D.N.Y.
CASHIERS

## CLASS ACTION COMPLAINT

Plaintiff Richard Peshkin ("Plaintiff") files this Class Action Complaint against Defendants Tremont Group Holdings, Inc. ("TGH"), Tremont Partners, Inc. ("TPI"), Rye Investment Management ("Rye Investment Management") (TGH, TPI, and Rye Investment Management are collectively referred to as "Tremont"), Oppenheimer Acquisition Corporation ("Oppenheimer AC"), OppenheimerFunds, Inc. ("OppenheimerFunds") (Oppenheimer AC and OppenheimerFunds are collectively referred to as "Oppenheimer"), Massachusetts Mutual Life Insurance Company ("MassMutual"), KPMG L.L.P. ("KPMG"), and John Does 1-100 Inclusive (collectively "Defendants"). Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through his attorneys. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF ACTION

1.    Tremont grossly neglected its professional and fiduciary duties to manage the capital invested by Plaintiff and other members of the proposed Class (collectively "Plaintiffs"). Tremont turned over all of Plaintiffs' capital to Bernard Madoff ("Madoff") and Bernard Madoff Investment Securities, Inc. ("BMIS"), who used that capital in a massive Ponzi-scheme. Tremont failed to perform proper due diligence, failed to exercise due care in managing private investments, and/or concealed from Plaintiffs the fact that Tremont was not actively overseeing and safeguarding Plaintiffs' investments.

2.    Over the past several years, Plaintiffs entrusted billions of dollars in capital to Tremont. Tremont, in turn, invested more than half of its total assets—roughly $3.3 billion dollars of its total assets—with Madoff. Most significantly, Plaintiffs had invested roughly $3.1

billion dollars with or through Tremont's Rye Investment Management funds ("the Rye Funds")——virtually all of which was given to Madoff.

3.      Tremont accepted substantial investment advisor service fees in connection with the capital solicited from Plaintiffs.  These fees were paid so that Tremont would vet suitable investment managers, assemble a diversified group of investments, follow a professional investment strategy, and conduct ongoing due diligence in order to avoid frauds and other unnecessary investment risks.

4.      For years, Tremont provided Plaintiffs with documentation of financial returns, such as account statements, that purported to reflect Tremont's active oversight of Plaintiffs' investment capital.

5.      All the while, Tremont unfairly, unlawfully, and deceptively neglected and/or abandoned professional oversight of Plaintiffs' capital, passing all of it on to Madoff without safeguards.  Madoff then used that capital to pay bogus returns to other investors.  Tremont failed to vet Madoff as a suitable investment manager, failed to diversify investments, failed to follow a sustainable investment strategy, and failed to conduct ongoing due diligence in order to identify and avoid massive fraud.

6.      KPMG provided professional auditing services with respect to the Tremont funds, for which KPMG accepted substantial fees.  Tremont and KPMG failed to use due care to prepare and disseminate accurate and complete financial reports regarding those funds that were managed by Madoff.  Tremont's reporting was at odds with generally accepted accounting practices (GAAP).  KPMG failed to conduct due diligence as Tremont's auditor, and it failed to conduct audits in accordance with generally accepted auditing standards (GAAS).

## II.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  This Court also has personal jurisdiction over Defendants because a substantial portion

of the wrongdoing alleged in this Complaint emanates from this state, all Defendants except MassMutual are based in this state, and all Defendants are authorized to do business here, have sufficient minimum contacts with this state, and/or otherwise intentionally avail themselves of the markets in this state through the marketing and solicitation of investments in this state, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue in this Court is proper under 28 U.S.C. §1391 because many of the transactions, acts, and practices described herein occurred within the jurisdiction of this district, and additionally, Defendants Oppenheimer Acquisition Corp., OppenheimerFunds, Inc., and KPMG L.L.P. are located in this District.

### III.    PARTIES

9.     Plaintiff Richard Peshkin is an individual residing in Boca Raton, Florida. Plaintiff invested his capital in Spectrum Select L.P. ("Spectrum"), and all of Spectrum's capital was invested with the Rye Funds (managed and controlled by Tremont). Tremont turned over Plaintiff's investment capital to Madoff, and such capital now appears to have been wiped out as a result of the activities alleged herein.

10.     Defendant Tremont Group Holdings, Inc. was formed in 1984 and is based in Rye, New York. The firm is the holding company for hedge funds. Robert Schulman ("Schulman") is Tremont's Chairman Emeritus. The company is a subsidiary of Oppenheimer Acquisition Corporation. In addition, Tremont is an affiliate of OppenheimerFunds. According to Schulman, Tremont increased its earnings and revenues five-fold during the 2002 to 2007 time-frame.

11.     Tremont Partners, Inc. is headquartered in Rye New York. It is the general partner and manager of the Rye Funds, and a subsidiary of Tremont Group Holdings, Inc.

12.     Defendant Rye Investment Management, based in Rye, New York, is a hedge fund group (the "Rye Funds") set up as a division of Defendant Tremont Group Holdings, Inc.

Rye Investment Management gave virtually all of its capital—roughly $3.1 billion—to Madoff. In 2007, Schulman stepped aside as Tremont's long-time Chief Executive Officer to become President of Rye Investment Management and to focus on its build-out. At some point in 2008, Schulman appears to have stepped down from serving as President of Rye Investment Management.

13.     Defendant Oppenheimer Acquisition Corporation is a securities investment advisory service company headquartered in New York, New York. It is a subsidiary of Massachusetts Mutual Life Insurance Co.

14.     Defendant OppenheimerFunds, Inc. is one of the largest asset management companies in the United States. It is headquartered in New York, New York, and has a number of controlled affiliates. OppenheimerFunds owns Tremont Group Holdings, Inc.

15.     Defendant Massachusetts Mutual Life Insurance Company, headquartered in Springfield, Massachusetts, is a mutually owned financial protection, accumulation and income management company. MassMutual and its subsidiaries had more than $500 billion in assets under management at year-end 2007. MassMutual is the majority owner of OppenheimerFunds. Oppenheimer's Chief Executive Officer in 2008, John Murphy, was previously an Executive Vice President of Defendant MassMutual and a Director of Defendant Tremont Group Holdings, Inc.

16.     Defendant MassMutual, as parent company to the Oppenheimer Defendants, and Oppenheimer as parent company to the Tremont Defendants, had the power to exercise complete control over Tremont with respect to the use of Madoff as an investment manager (MassMutual and Oppenheimer are collectively referred to herein as the "Tremont Affiliates"). On information and belief, Oppenheimer paid a purchase price for Tremont that was roughly 10 times its tangible net worth, and roughly 25 times its net income. The Tremont Affiliates pushed for high-return investments through use of investment managers like Madoff. Consequently, Tremont gave virtually all of the Rye Funds to Madoff, causing serious financial injury to Plaintiffs.

17.    Defendant KPMG L.L.P. is a limited liability company based in New York, New York.  KPMG provides audit, tax, and advisory services.  KPMG LLP is the United States member firm of KPMG International, a Swiss Cooperative that is known as one of the "Big Four" auditing firms.

18.    Upon information and belief, John Does 1-100 ("Doe Defendants") are individuals or entities whose names and addresses are presently unknown.  Plaintiffs do not know the specific identities of the Doe Defendants at this time, however, Plaintiffs will amend the complaint once their identities are learned.

## IV.    GENERAL ALLEGATIONS

### The Madoff/BMIS Ponzi-Scheme

19.    Madoff is a former chairman of the Board of Directors of the Nasdaq stock market.   He controls the investment adviser services and finances at BMIS, and he is the sole owner of BMIS, a company which Madoff appears to have founded in the 1960s.

20.    Defendant BMIS is a broker-dealer and investment adviser registered with the SEC.  BMIS formally engaged in three operations, which include investment adviser services, market making services, and proprietary trading.

21.    A number of fund managers recently expressed wariness of investing with Madoff because there was little or no transparency to link his reported financial returns to actual securities transactions.

22.    In the first week of December 2008, a senior BMIS employee apparently understood that the company's investment advisory business had between $8 billion and $15 billion in assets under management.  On or about December 9, 2008, Madoff informed another senior employee that Madoff wanted to pay early bonuses to BMIS employees.

23.    On or about December 10, 2008, the two senior employees met with Madoff at his apartment in Manhattan.  At that time, Madoff informed them that, in substance, his investment

advisory business was a fraud.  Madoff is reported to have stated that <u>he was "finished," that he had "absolutely nothing," that "it's all just one big lie" and that the business was "basically, a giant Ponzi-scheme."</u>

24.     In substance, Madoff admitted that he had for years been paying returns to certain investors out of the principal received from other investors.  Madoff also stated that BMIS was insolvent, and that it had been for years.  Madoff also estimated the losses from this fraud to be approximately $50 billion dollars.

25.     Madoff further informed the two senior employees that he planned to surrender to authorities, but first, he still had about $200 million to $300 million dollars left, and he intended to distribute it to certain selected employees, family, and friends.

26.     There were several red flags with regard to Madoff's illicit use of investment funds, including the following:  (i) Madoff's investment returns appeared to outperform the market with a vengeance despite the fact that money managers rarely beat the market indexes by any substantial amount over time; (ii) Madoff's investment returns appeared to earn steady monthly increases of 1% or more, even when markets went bad; (iii) no one was able to replicate Madoff's remarkable results with the strategies he claimed to be using; (iv) Madoff was not using professional auditors commensurate with the $17 billion that he claimed to have under management (he reported using a tiny office in upstate New York that apparently was not even open all of the time); (v) Madoff claimed to hold publicly traded investments in his own advisory firm, without using a reliable custodian, namely a large, independent financial institution that distributes financial reports directly to investors; (vi) Madoff kept the records of his investment advisory business under lock and key, with little or no internal oversight of his activities; (vii) Madoff's suspicious investment activities had been cited to the SEC on more than one occasion; and (viii) a number of other hedge-fund advisers say that they had examined Madoff's operations and warned investors off.

**Tremont And Tremont Affiliates**

27.     Tremont has engaged and continues to engage in the business of managing private capital investments.

28.     Oppenheimer has touted Tremont to the investment community: "In the world of hedge funds, where information is more difficult to obtain than in more conventional financial arenas, Tremont is a name that commands respect. Founded in 1984, Tremont is a global leader in the hedge fund industry." In particular, Oppenheimer emphasized Tremont's expertise in managing other fund managers: "Tremont's history and manager expertise bring a strong investment team to the table to work for you. Because of their 'hedge fund of funds' approach, Tremont's team has extensive experience managing other fund managers."

29.     In this case, however, Tremont essentially abandoned its professional responsibilities. Tremont negligently and/or recklessly mismanaged the capital invested by Plaintiffs, failed to monitor and oversee that capital, failed to safeguard that capital, and/or failed to warn Plaintiffs thereof. Most notably, Tremont solicited clients to invest in the Rye Funds, turned over virtually all of the capital in the Rye Funds to Madoff as an exclusive investment manager, and abdicated Tremont's responsibility to supervise and safeguard that capital.

30.     Tremont was founded by Sandra Manzke in 1985, and sold Madoff-managed investments since 1997. Tremont promised "disciplined risk budgeting and monitoring" and "a strategic investment approach" that is considered "rigorous".

31.     According to Tremont's website: "Effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives." Tremont promised to assess risk at every aspect of its investment process and to provide strong corporate oversight.

32.     The Rye Funds, in particular, appear to have been touted by Tremont as an exclusive opportunity for limited investors. A minimum investment to get into the "Rye Select Broad Market Fund", for example, was listed at $500,000 (although investors could be granted

the privilege of joining for less).  According to Tremont's marketing materials, in order to achieve long-term capital growth for investors, the Rye Select Fund "entrusts the management of its assets to investment advisers that have conservative investment styles. . . ."  The same marketing materials show steady year-to-date returns from 1998-2008 ranging from 8%-16%, and portray the Rye Select Fund as providing more return *for less risk*.  Tremont collected substantial "management" fees (e.g., a 1% annual fee based on assets invested in the Rye Funds).

33.     Tremont aggressively solicited new investments in the Rye Funds during the last few weeks before news of the Ponzi scheme became public.  At that time, Tremont suggested to investors that they had "better move and move quick" if they wanted a "chance" to invest in the Rye Funds.  Moreover, investors were told that "now is a great time" to invest.

34.     Tremont managed a total of about $5.8 billion in investments.  Tremont collected and assumed responsibility for Plaintiffs' capital in the Rye Funds worth roughly $3.1 billion dollars.

35.     Tremont may have pocketed tens of millions of dollars in fees each year selling interests in Tremont funds that were solely managed by Madoff.  Despite accepting substantial fees for managing the Rye Funds, Tremont actually gave virtually all of the Rye Funds' reported $3.1 billion to Madoff without supervision, plus an additional $200 million from a separate fund.

36.     According to Forbes online business news (December 16, 2008): "When asked who was responsible for Rye's investment strategy -- which, essentially, consisted of giving Madoff all the money – [Tremont's spokesman] refused to comment."

37.     Defendants were aware, or should have been aware, of the many red flags described above.  Defendants knew, or reasonably should have known, that Madoff's investment holdings and returns had not been properly verified, and that Plaintiffs' capital was not being safeguarded by a reliable custodian.

38.     Among other things, Tremont and the Tremont Affiliates failed: (a) to perform due diligence as to Madoff's investment activities; (b) to investigate each of the various red flags with regard to Madoff's use of Plaintiffs' capital; (c) to independently verify Madoff's financial

statements; (d) to monitor the ongoing risks associated with Madoff's use of Plaintiffs' capital; (e) to inform investors that Madoff's use of their funds was unsupervised; and (f) to safeguard Plaintiffs' investments from excessive risks of loss.

39.     Tremont provided account statements and/or other routine indications to Plaintiffs that Tremont was managing and overseeing their capital investments.  Tremont failed to disclose the lack of vetting, monitoring, supervision, and safeguards with respect to Plaintiffs' investments.

40.     Defendants' actions, and failures to act, enabled Madoff to plunder the capital that Plaintiffs had invested with Tremont, thereby injuring Plaintiffs.


**KPMG's Conduct**

41.     In offering its auditing services, KPMG promised to provide rigorous independent audits of client financial reports, audits that are designed to meet national auditing standards. The KPMG methodology purportedly included effective risk assessment and control testing.

42.     In addressing past failures at KPMG, the SEC has explained that: "[A]ccounting firms must assume responsibility for ensuring that individual auditors properly discharge their special and critical gate keeping duties."

43.     In this case, KPMG failed to identify a massive fraud that covered more than 50% of Tremont's investment capital.

44.     Through its audits, KPMG represented to investors that Tremont's financial reports presented fairly, in all material respects, the financial position of the Rye Funds.

45.     KPMG, as Tremont's auditor, was required to assure Tremont's compliance with GAAP, and to review and consider risk factors for fraud, such as deficient internal controls at Tremont.

46.     Tremont had no internal system for evaluating the veracity of financial returns claimed by Madoff.  Moreover, Tremont was unable or unwilling to analyze the financial returns claimed by Madoff, nor the data available to it to conduct such an analysis.  Since the financial

returns were routinely fabricated, it is apparent that neither the Tremont Defendants nor KPMG conducted any such analysis.

47.     In truth, the account statements from Tremont misrepresented the actual returns, assets under management, and losses or liabilities of the Rye Funds.  The reports were also incomplete in that they failed to disclose the lack of internal controls and lack of evidence to support the stated financial results.

48.     There were repeated audit failures in connection with KPMG's audits of Tremont's financial reporting.  KPMG knew or reasonably should have known that Tremont improperly recognized and reported returns, assets, losses and/or liabilities associated with the capital given to Madoff for management.

49.     KPMG's auditors relied excessively on Tremont's management's representations even when those representations were not supported by their audit work.  The auditors thus failed to exercise professional skepticism and due care.

50.     In essence, KPMG gave Tremont a clean bill of health even though Tremont had not provided sufficient evidence to support the reported returns, assets, losses and/or liabilities. KPMG also knew or reasonably should have known that it had failed to obtain sufficient competent evidence from Madoff and BMIS about Madoff-managed capital to support Tremont's financial reports.  KPMG's audits of Tremont's reports were grossly negligent insofar as KPMG failed to properly plan and perform due diligence in the course of its audits.

51.     KPMG's audits did not comply with generally accepted auditing standards (GAAS).  Had KPMG planned and performed proper due diligence, had it not relied excessively on management's representations, had it exercised professional skepticism and due care, and/or had it obtained sufficient evidence about the use of the capital invested with Tremont, then KPMG's audits would have uncovered Tremont's true financial return data and the lack of adequate safeguards in place to protect Plaintiffs' investments.

## V.   CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of all persons or entities who, directly or indirectly, had capital invested with or through Rye Investment Management (a Division of Tremont Group Holdings, Inc.), including without limitation Tremont's Rye Select Broad Market Fund and Rye Select Broad Market Fund XL, as of December 12, 2008, where such capital was passed on to Bernard Madoff and/or Bernard Madoff Investment Securities. Excluded from the proposed Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

53.     The members of the proposed Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are several hundred, if not thousands, of members in the proposed Class.  Members of the proposed Class may be identified from records maintained by the Defendants.

54.     Plaintiff's claims are typical of the claims of the members of the proposed Class as all members of the proposed Class are similarly affected by Defendants' wrongful conduct as alleged herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the proposed Class and has retained counsel competent and experienced in complex class litigation.

56.     Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. Among the questions of law and fact common to the proposed Class are:

a.   Whether Defendants owed fiduciary duties to Plaintiffs as alleged herein, including without limitation the following duties:

    i.   To exercise due diligence and reasonable care in vetting investment managers and the use of Plaintiffs' capital;

    ii.   To monitor, oversee and safeguard Plaintiffs' capital;

    iii.   To disseminate proper account statements;

    iv.   To perform competent audits;

    v.   To disclose conflicts of interest and other material information affecting Plaintiffs' investments; and/or

    vi.   To warn Plaintiffs when their capital has been placed at an excessive risk of loss.

b.   Whether Defendants breached any or all of their fiduciary duties to Plaintiffs;

c.   Whether Defendants concealed or neglected to disclose material information about the lack of vetting, monitoring, oversight and safeguards with respect to Plaintiffs' investments;

d.   Whether Defendant engaged in deceptive business acts or practices under New York state law; and

e.   To what extent the members of the Class have sustained damages, and the proper measure of damages.

57.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joining all members is impracticable, and this action will be manageable as a class action.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM:

### BREACH OF FIDUCIARY DUTY

### AGAINST ALL DEFENDANTS EXCEPT KPMG

58.    Paragraphs 1 thorough 57 are realleged and incorporated by reference as if set forth fully herein.

59.     Plaintiffs entrusted their capital to Defendants in exchange for substantial fees.
Defendants therefore assumed, and owed to Plaintiffs, the following fiduciary duties (among
others):

a.   The duty to use reasonable care, and the competence of a skilled investment
advisor, when performing due diligence and ensuring the legitimacy of
opportunities for investing Plaintiffs' capital;

b.   The duty to use reasonable care, and the competence of a skilled investment
advisor, in managing, overseeing and safeguarding Plaintiffs' invested capital;

c.   The duty to use reasonable care, and the competence of a skilled investment
advisor, in disseminating proper account statements;

d.   The duty to deal fairly and in good faith with Plaintiffs;

e.   The duty to avoid and disclose conflicts of interests with Plaintiffs; and

f.   The duty to warn Plaintiffs when their capital has been placed at an undue risk
of loss.

60.     Defendants breached their fiduciary duties owed to Plaintiffs.  Among other
things:

a.   Defendants failed to perform proper due diligence;

b.   Defendants failed to manage Plaintiffs' investments;

c.   Defendants failed to use reasonable care, or the competence or skill of a
professional investment advisor, to avoid the unlawful Ponzi-scheme operated
by Madoff and BMIS;

d.   Defendants failed to use reasonable care, or the competence or skill of a
professional investment advisor, in giving virtually all of Plaintiffs' invested
capital to Madoff and BMIS;

e.   Defendants failed to use reasonable care, or the competence or skill of a
professional investment advisor, when they abandoned management and
oversight of Plaintiffs' invested capital;

      f.   Defendants concealed and/or failed to disclose the nature and scope of their activities in funneling Plaintiffs' capital to Madoff and BMIS, which capital ultimately was used in a massive Ponzi-scheme;

      g.   Defendants failed to use reasonable care, or the competence or skill of a professional investment advisor, insofar as they failed to provide proper account statements;

      h.   Defendants failed to deal fairly and in good faith with Plaintiffs;

      i.   Defendants failed to avoid conflicts of interest with Plaintiffs when Defendants engaged in transactions with Madoff and BMIS in order to advance Defendants' own self-interests; and

      j.   Defendants failed to warn Plaintiffs that Plaintiffs' capital was being subjected to an unreasonably high risk of loss from fraud.

61.    As a direct and proximate result of Defendants' breaches of fiduciary duties, Plaintiffs lost their investment capital, and thereby suffered damages in an amount to be proven at trial.

## SECOND CLAIM:
## BREACH OF FIDUCIARY DUTY
## AGAINST DEFENDANT KPMG

62.    Paragraphs 1 thorough 61 are realleged and incorporated by reference as if set forth fully herein.

63.    In exchange for substantial service fees, KPMG agreed to provide rigorous independent audits with respect to Tremont's financial reports.  Plaintiffs were the intended beneficiaries of the audits and recipients of account statements based on the audits.  Therefore, KPMG owed a duty to Plaintiffs to audit Tremont's financial reports diligently, independently,

competently, and consistent with GAAS.  For the same reasons, KPMG had a duty to warn Plaintiffs about any auditing deficiencies.

64.     As a result of its auditing activities, KPMG knew or reasonably should have known that Tremont improperly recognized and reported returns, assets, losses, and/or liabilities associated with the capital given to Madoff for management.   KPMG also knew or reasonably should have known that Tremont did not have sufficient evidence regarding capital under Madoff's control to support Tremont's financial reports.

65.     KPMG breached its fiduciary duties to perform diligent independent audits of Tremont's financial reports consistent with GAAS.  Among other things:

      a.   KPMG failed to identify excessive risks of loss associated with Tremont giving its entire $3.1 billion dollar Rye Funds to Madoff;

      b.   KPMG failed to identify any indicia of the massive fraud being conducted by Madoff and BMIS with respect to the majority of Tremont's capital;

      c.    KPMG failed to perform effective control testing to ensure the accuracy of Tremont's financial reports;

      d.   KPMG failed to exercise professional skepticism and due care when auditing Tremont's financial reports;

      e.   KPMG approved of Tremont's financial reports without sufficient evidence to do so, and despite the fact that Tremont's financial reports were not in conformity with GAAP; and

      f.   KPMG failed to warn Plaintiffs about the auditing deficiencies described above.

66.     As a direct and proximate result of Defendant KPMG's breach of fiduciary duties, Plaintiffs lost their investment capital, and thereby suffered damages in an amount to be proven at trial.

### THIRD CLAIM:

### FRAUDULENT CONCEALMENT

### AGAINST ALL DEFENDANTS EXCEPT KPMG

67.     Paragraphs 1 thorough 66 are realleged and incorporated by reference as if set forth fully herein.

68.     Defendants concealed the material facts that they were *not*:

    a.   Performing due diligence in connection with Plaintiffs' investments;

    b.   Monitoring and overseeing Plaintiffs' investments; and/or

    c.   Safeguarding those investments from excessive risks of loss.

69.     Plaintiffs entrusted their capital to Defendants in exchange for substantial fees. As a result, Defendants had a duty to disclose the facts that they were not vetting, monitoring, overseeing, and safeguarding Plaintiffs' investments.

70.     Plaintiffs reasonably, justifiably, and materially relied upon the expectation that Defendants would vet, monitor, oversee, and safeguard Plaintiffs' investments.

71.     Defendants knew and intended that their concealment of such facts would create a false impression in Plaintiffs that their investments were being professionally vetted, monitored, overseen, and safeguarded.  Defendants also issued account statements that fostered this misimpression.

72.     Plaintiffs would not have entrusted their capital to Defendants had Plaintiffs known that Defendants were not conducting due diligence, were not monitoring and overseeing Plaintiffs' investments, and were not safeguarding those investments.

73.     As a direct and proximate result of Defendants' concealment, Plaintiffs lost their capital and thereby suffered damages in an amount to be proven at trial.

## FOURTH CLAIM:

## NEGLIGENT MISREPRESENTATION

### AGAINST ALL DEFENDANTS

74.    Paragraphs 1 thorough 73 are realleged and incorporated by reference as if set forth fully herein.

75.    Plaintiffs entrusted their capital to Defendants in exchange for substantial professional fees.  Therefore, Defendants had a duty to use reasonable care when providing investment management services to Plaintiffs or disseminating account statements in connection with those services. Defendants also had a duty to disclose the facts that they were not vetting, monitoring, overseeing, and safeguarding Plaintiffs' investments.

76.    KPMG agreed to provide independent audits with respect to the Rye Funds and in exchange for substantial professional fees.  Therefore, KPMG owed a duty to Plaintiffs to audit the Rye Funds diligently, independently, competently, and consistent with GAAS.

77.    Defendants breached the duty to use reasonable care by failing to disclose the material facts that Defendants were *not*:

> a.   Performing due diligence in connection with Plaintiffs' investments;
>
> b.   Monitoring and overseeing Plaintiffs' investments;
>
> c.   Safeguarding those investments from excessive risks of loss; and/or
>
> d.   Auditing the Rye Funds in accordance with GAAS.

78.    Defendants knew that investors would rely on the account statements provided by Tremont in selecting between investment management firms.

79.    Plaintiffs reasonably, justifiably, and materially relied upon the expectation that Defendants would vet, monitor, oversee, safeguard, and audit Plaintiffs' investments.

80.    Plaintiffs would not have entrusted their capital to Defendants had Plaintiffs known that Defendants were not conducting due diligence, were not monitoring and overseeing Plaintiffs' investments, were not safeguarding those investments, or were not auditing the financial reports for the Rye Funds consistent with GAAS.

81.    As a direct, proximate, and foreseeable result of Defendants' negligence, Plaintiffs lost their capital and thereby suffered damages in an amount to be proven at trial.

## FIFTH CLAIM:

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW SECTION 349 (AGAINST ALL DEFENDANTS EXCEPT KPMG)

82.    Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs 1-81 as if set forth fully herein.

83.    Defendants engaged in deceptive acts or practices in the conduct of a business, trade or commerce, or in the furnishing of a service, in the state of New York. Such acts and/or practices violate New York General Business Law Section 349.

84.    Defendants obtained Plaintiffs' investment capital by means of the deceptive acts or practices alleged herein.

85.    Plaintiffs have been injured by such deceptive acts or practices, which induced Plaintiffs to invest their capital with Tremont, and ultimately resulted in substantial financial losses. Plaintiffs have suffered actual damages in an amount to be proven at trial.

86.    Plaintiffs reserve the right to identify additional violations of New York and/or federal law committed by the Defendants as further investigation and discovery warrants.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest and any enhanced damages thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.


### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


DATED:  December 22, 2008

HAGENS BERMAN SOBOL SHAPIRO LLP


By _____

DAVID S. NALVEN, DN-2374
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA, 02142-1531
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

410 Park Avenue, Suite 1530
New York, NY, 10022
Telephone: (212) 231-8378
Facsimile: (212) 231-8379

STEVE W. BERMAN
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

REED KATHREIN
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (501) 725-3001

LEE M. GORDON
HAGENS BERMAN SOBOL SHAPIRO LLP
700 South Flower St., Suite 2940
Los Angeles, CA  90017-4101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

*Attorneys for Plaintiff and the Proposed Class*