UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

IN RE TREMONT SECURITIES LAW,   :
STATE LAW AND INSURANCE     :   Master File No.:
LITIGATION                   :   08 Civ. 11117 (TPG)
                                :

-------------------------------------------------- x   **JURY TRIAL DEMANDED**

This Document Relates to:  State Law Actions  :
08 Civ. 11183 (TPG)                 :   "ECF Case"

-------------------------------------------------- x

# FIRST CONSOLIDATED AND AMENDED
## CLASS ACTION AND VERIFIED DERIVATIVE COMPLAINT

**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue
26th Floor West
New York, New York 10017
(212) 894-7200

*Counsel for Plaintiffs Arthur E. Lange*
*Revocable Trust and Arthur C. Lange*


**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
(510) 725-3000

*Counsel for Plaintiffs Eastham Capital*
*Appreciation Fund LP, NPV Positive Corp.,*
*John Dennis, Daniel Jackson, Laborers*
*Local Pension Plan 17 and Richard Peshkin*

Co-Lead Counsel for Plaintiffs

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION .................................................................. 1

II.    JURISDICTION AND VENUE ............................................................ 4

III.   THE PARTIES................................................................................... 4

    A.    Plaintiffs ............................................................................ 4

    B.    Defendants ......................................................................... 6

        1.    The MassMutual Defendants ..................................... 6

        2.    The Tremont Defendants ......................................... 7

        3.    The Auditor Defendants........................................... 8

        4.    BNY ................................................................... 8

        5.    SS&C Defendants ................................................... 9

        6.    The Sub-Feeder Fund Defendants .............................. 9

    C.    Nominal Defendants ...........................................................10

    D.    Non-Party Actors ...............................................................12

IV.   FACTUAL BACKGROUND ............................................................ 14

    A.    Madoff's Ostensibly Legitimate
        Investment Advisory Business...............................................14

    B.    The Rye Funds Served as the Conduit Through
        Which Plaintiffs' Assets Were Funneled to Madoff ...................15

        1.    Rye Market Fund ................................................ 16

        2.    Rye Prime Fund ................................................. 17

        3.    Rye XL Fund...................................................... 18

        4.    Rye Market Portfolio ........................................... 19

        5.    Rye XL Portfolio................................................. 20

    C.    MassMutual Targets Tremont As a Means of
        Expanding Into the Alternative Investments Arena.................21

i

D.      MassMutual's Due Diligence Into Tremont's
        Operations and Close Ties to Madoff ..................................................24

E.      MassMutual Welcomes
        Tremont Into the Fold ........................................................................27

F.      MassMutual's Extensive Control
        Over Tremont's Rye Funds...............................................................29

        1.      Control of Tremont Advisers........................................... 30

        2.      Control of OAC.................................................................. 33

        3.      Control of MassMutual Holding....................................... 36

        4.      Control of Tremont
                Partners and the Rye Funds............................................. 39

G.      Tremont Is Marketed as a Member of the
        MassMutual Family of Companies.....................................................40

H.      Madoff's "Giant Ponzi Scheme" Implodes..........................................43

I.      Madoff Is Arrested .............................................................................45

J.      Madoff Pleads Guilty ........................................................................46

K.      The Devastation Wrought by Madoff's Scheme ...................................47

L.      The Defendants Recklessly Overlooked or Ignored a
        Host of Red Flag Warnings Regarding Madoff's Scheme ....................48

        1.      Returns Too Consistently Good to Be True............................... 49

        2.      BMIS's Auditing Firm
                Was Plainly Unqualified ......................................................... 50

        3.      Skepticism in the Financial Press
                Regarding Madoff's Operations ............................................. 52

        4.      Madoff's Investment Strategy
                Had No Basis in Reality.......................................................... 52

        5.      BMIS's Retention of
                Custody Over Investor Assets.................................................. 53

        6.      BMIS Acted As Its
                Own Broker-Dealer................................................................. 53

7.       BMIS's Documentation
Was Highly Suspect............................................................... 54

8.       Madoff's Unorthodox Fee Structure....................................... 55

9.       BMIS Was a Family Affair....................................................... 56

10.     BMIS's Comptroller
Was Based in Bermuda........................................................... 56

M.     Other Sophisticated Entities Spotted Trouble
At BMIS and Steered Clear of Madoff .....................................57

N.     The Red Flags Could Not Have Been Missed Had Tremont
Performed the Due Diligence It Claimed to Perform ...........60

O.     The Auditors' Roles..................................................................63

1.       E&Y ............................................................................. 63

2.       KPMG ......................................................................... 64

3.       The Auditors' Failures
Facilitated Madoff's Ponzi Scheme ........................ 65

P.     BNY's Role...........................................................................…..77

Q.     SSC's Role ..............................................................................81

R.     Role of the Sub-Feeder Funds................................................84

1.       FutureSelect Prime................................................... 84

2.       Austin Safe Harbor Fund ........................................ 85

3.       Spectrum Select ....................................................... 87

V.     CLASS ACTION ALLEGATIONS .................................................... 88

VI.    ADDITIONAL DERIVATIVE ACTION ALLEGATIONS............................. 90

VII.   CAUSES OF ACTION ...................................................................... 93

COUNT I ....................................................................................................... 93

BREACH OF FIDUCIARY DUTY

COUNT II…………………………………………………………………………………………… 95

AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

COUNT III……………………….............................................................................98

UNJUST ENRICHMENT

COUNT IV...................................................................................... 100

BREACH OF CONTRACT

COUNT V ...................................................................................... 100

BREACH OF FIDUCIARY DUTY

COUNT VI...................................................................................... 100

BREACH OF FIDUCIARY DUTY

COUNT VII .................................................................................... 105

BREACH OF FIDUCIARY DUTY

COUNT VIII ................................................................................... 106

BREACH OF FIDUCIARY DUTY

COUNT IX...................................................................................... 108

MALPRACTICE AND PROFESSIONAL NEGLIGENCE

COUNT X ...................................................................................... 109

MALPRACTICE AND PROFESSIONAL NEGLIGENCE

COUNT XI...................................................................................... 110

MALPRACTICE AND PROFESSIONAL NEGLIGENCE

COUNT XII .................................................................................... 111

MALPRACTICE AND PROFESSIONAL NEGLIGENCE

COUNT XIII ........................................................................................................................ 113

     UNJUST ENRICHMENT

COUNT XIV ....................................................................................................................... 114

     VIOLATION OF ERISA

VIII.   PRAYER FOR RELIEF ............................................................................................ 115

IX.     JURY TRIAL DEMANDED ................................................................................... 116

Plaintiffs the Arthur E. Lange Revocable Trust, Arthur C. Lange, Eastham Capital Appreciation Fund LP and NPV Positive Corp. (collectively, "Class Plaintiffs"), individually and on behalf of all others similarly situated, Eastham Capital Appreciation Fund LP, NPV Positive Corp., John Dennis, Daniel Jackson, Laborers Local Pension Plan 17 and Richard Peshkin (collectively, "Derivative Plaintiffs"), derivatively on behalf of nominal defendants Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LP, Rye Select Broad Market XL Fund LP, Rye Select Broad Market Portfolio Limited, Rye Select Broad Market XL Portfolio Limited, FutureSelect Prime Advisor II, LLC, Austin Capital Management, Ltd. and Spectrum Select L.P., allege the following upon information and belief (except as to those allegations specifically pertaining to plaintiffs of which they have personal knowledge) based upon the investigation conducted by and under the supervision of plaintiffs' counsel, which is ongoing, and to date has included reviewing and analyzing information and financial data obtained from numerous public and proprietary sources, filings with the Securities and Exchange Commission ("SEC"), other regulatory and court filings, press releases, published interviews, news articles and other media reports.

## I.     NATURE OF THE ACTION

1.      This action arises out of the $50 billion Ponzi scheme orchestrated by convicted swindler Bernard L. Madoff.  Thousands of investors from throughout the world fell victim to Madoff's scam that, according to federal authorities, was unprecedented in its size and scope until it imploded in December 2008.

2.      Each of these investors was ensnared in Madoff's scheme in one of two ways.  Some victims invested directly with Madoff.  The majority of victims, however, were bilked by investing indirectly with Madoff through an extensive network of "feeder funds" that provided Madoff with the massive and continuous infusions of assets necessary to sustain his

scheme for years.  The managers of those feeder funds pocketed staggering fees from clients who relied on the managers' integrity and purported investing acumen, only to learn that those fiduciaries and purported experts had blindly channeled their assets into the hands of one of history's most reviled confidence men.

3.      Plaintiffs bring this action on behalf of themselves and the class, as defined further below, consisting of all investors in one of the largest families of these now notorious Madoff feeder funds -- the so-called Rye group of feeder funds operated through defendant Tremont Group Holdings, Inc. as part of the MassMutual Financial Group -- and derivatively on behalf of those Rye feeder funds.

4.      The Rye funds' managers, and the highly sophisticated corporate entities that operated, controlled and/or assisted them, turned a blind eye to Madoff's nefarious operations and reaped hundreds of millions of dollars in fees from these plaintiffs whose assets were entrusted to and ultimately plundered by Madoff.  Motivated by unchecked greed, the persons and entities responsible for the Rye feeder funds abdicated any notion of fiduciary responsibility to their clients and funneled billions of dollars into a scam they should have detected had they made even a modestly diligent effort to do so.

5.      Class Plaintiffs and the class sustained in excess of $3 billion in losses due to the shamefully avaricious conduct of the Rye funds' managers and the corporate entities that operated, controlled and/or assisted them.  The Rye funds sustained substantial damage as a result of the acts and/or omissions of certain of the defendants herein.

6.      The Rye funds' managers, and the entities that operated, controlled and/or assisted them, utterly failed to investigate Madoff or monitor what he was doing with their clients' assets.  They either recklessly overlooked or disregarded a raft of red flag warnings

regarding Madoff's fraudulent scheme.  Gorging on the fees flowing from their relationship with Madoff, the defendants -- all of whom were in a superior position to detect Madoff's fraudulent scheme -- did absolutely nothing to shield these plaintiffs and the class from Madoff's criminal enterprise.

7.      While Plaintiffs and the class were relying on the managers of the Rye funds to vet and monitor the entity to which their investments were being entrusted, those managers in fact were merely serving as Madoff's unquestioning sales force that supplied Madoff with the flow of cash necessary to sustain the scam and ensnare an ever widening circle of victims.

8.      Plaintiffs on behalf of the class seek to recover their catastrophic losses from defendant Tremont Partners, Inc., the general partner of the Rye feeder funds; Tremont Group Holdings, Inc., the corporate parent of that general partner; and Harry Hodges, vice president of investor services at Rye Investment Management Group, the division of Tremont Group Holdings, Inc. through which the feeder funds were marketed and sponsored.

9.      Further, Plaintiffs on behalf of the class seek to recover from defendants Massachusetts Life Insurance Company, MassMutual Holding Company, Oppenheimer Acquisition Corp. and OppenheimerFunds, Inc.  Each of these defendants -- members of the MassMutual Financial Group into which the Rye funds were subsumed in 2001 -- maintained significant influence and/or control over and provided substantial assistance to the entities that managed and operated the funds.

10.      In addition, plaintiffs sue derivatively to recover the Rye Funds' losses from the auditors, fund administrators and others whose acts and/or omissions facilitated Madoff's scheme.

11.     By overlooking or disregarding glaring red flags regarding Madoff's criminal enterprise, by wholly abdicating their responsibilities to plaintiffs and the class, and by channeling billions of dollars of their clients' assets into the black hole that was Madoff's Ponzi scheme, these defendants breached their fiduciary duties, aided and abetted those breaches of fiduciary duty, were unjustly enriched, and/or breached their contractual obligations to plaintiffs, whose resulting losses have been nothing short of ruinous.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) as well as principles of pendent and ancillary jurisdiction.

13.     With respect to claims on behalf of employee benefit plans, this matter also arises under Section 409 and 502(a)(2) & (3) of the Employee Retirement Income Securities Act ("ERISA"), as amended, 29 U.S.C. §§ 1109, 1132(a)(2) & (3).  This Court has subject matter jurisdiction pursuant to Section 502(d) of ERISA, 29 U.S.C. § 1132(e), and 28 U.S.C. §§ 1331 and 1337.  Venue is appropriate pursuant to 29 U.S.C. § 1132(e)(2).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of defendants' conduct giving rise to the causes of action occurred in this District.  Defendants also conduct substantial business in this District.

## III.     THE PARTIES

### A.     Plaintiffs

15.     Plaintiff the Arthur E. Lange Revocable Trust ("Lange Trust") is a revocable trust established in or about 1997 under the laws of the State of New York for the benefit of Arthur E. Lange, his wife, children and grandchildren.

16.     The Lange Trust had approximately $2.9 million invested in two of the Rye feeder funds at issue here, all of which was lost to Madoff's scheme as a result of the defendants' acts and/or omissions.

17.     Plaintiff Arthur C. Lange ("Lange") is a resident of the State of New York.

18.     Lange had approximately $2.1 million invested in one of the Rye feeder funds at issue here, all of which was lost to Madoff's scam as a result of the defendants' acts and/or omissions.

19.     The Lange Trust and Lange are referred to collectively herein as the Class Plaintiffs.

20.     Plaintiff NPV Positive Corp., ("NPV Positive"), a corporation organized under the laws of the British Virgin Islands with its principal place of business in the British Virgin Islands, invested in one of the Rye feeder funds at issue here.

21.     Plaintiff Eastham Capital Appreciation Fund LP ("Eastham Capital"), a limited partnership organized under the laws of Delaware with its principal place of business in Scottsdale, Arizona, invested in one of the Rye feeder funds at issue here.

22.     Plaintiff Richard Peshkin, a resident of the State of Florida, invested in a limited partnership that invested in one of the Rye feeder funds at issue here.

23.     Plaintiff John Dennis, a United States citizen currently residing in Switzerland, invested in an investment fund that invested in one of the funds at issue here.

24.     Plaintiff Laborers Local 17 Pension Plan ("Laborers Pension Plan"), a pension plan and maintains its principal offices at 451 B Little Britain Road, Newburgh, New York 12550, invested in an investment fund that invested in one of the funds at issue here.

25.      Plaintiff Daniel Jackson is the Employee Benefits Administrator and a named fiduciary of Laborers Pension Plan.

**B.**      **Defendants**

**1.**      **The MassMutual Defendants**

26.      Defendant Massachusetts Mutual Life Insurance Company ("MassMutual") is a mutual life insurance company organized under the laws of the Commonwealth of Massachusetts and maintains its principal place of business at 1295 State Street, Springfield, Massachusetts.  Operating through a network of subsidiaries and affiliates that included the Rye feeder funds at issue here, MassMutual is a leading financial services organization providing insurance and investment products and services to clients throughout the world.

27.      Defendant MassMutual Holding Company ("MassMutual Holding") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 1295 State Street, Springfield, Massachusetts.   MassMutual Holding is a wholly owned subsidiary of MassMutual.  According to Mass Mutual's statutory financial statements, MassMutual Holding's primary investments are in businesses such as the OppenheimerFunds, Inc. that marketed and supported the Rye feeder funds at issue here.

28.      Defendant Oppenheimer Acquisition Corp. ("OAC") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 2 World Financial Center, New York, New York.  OAC is a subsidiary of MassMutual Holding. In 2001, OAC acquired the corporate entity that formed and operated the Rye feeder funds at issue here.

29.      OppenheimerFunds, Inc. ("OppenheimerFunds") is a corporation organized under the laws of the State of Colorado and maintains its principal place of business at

6

2 World Financial Center, New York, New York.  OppenheimerFunds, a subsidiary of OAC, is a

leading asset management company offering investment products and services to individuals,

corporations and institutions.

        30.     MassMutual, MassMutual Holding, OAC, Oppenheimer Funds and

Tremont Group (including its subsidiaries, affiliates and predecessor entities) at all relevant

times operated as part of the vast network of MassMutual subsidiaries and affiliates operating

under the marketing name of MassMutual Financial Group.

### 2.     <u>The Tremont Defendants</u>

        31.     Defendant Tremont Group Holdings, Inc. ("Tremont Group") is a

corporation organized under the laws of the State of Delaware and maintains its principal place

of business at 555 Theodore Fremd Avenue, Rye, New York.  Tremont Group is a wholly owned

subsidiary of OAC.  Tremont Group was formerly known as Tremont Advisers, Inc. ("Tremont

Advisers") and Tremont Capital Management, Inc.

        32.     Defendant Harry Hodges is a resident of the State of New York and at all

relevant times was the vice president of investor services at Rye Investment Management Group

("Rye Investment Management"), the division through which Tremont Group and its

predecessors managed, sold and administered the firm's line of "single manager" investment

products, including the Rye feeder funds at issue here.

        33.     Defendant Tremont Partners, Inc. ("Tremont Partners") at all relevant

times was a corporation organized under the laws of the State of Connecticut and maintained its

principal place of business at 555 Theodore Fremd Avenue, Rye, New York.  At all relevant

times, Tremont Partners was a subsidiary of Tremont Group or its predecessors and engaged in

the business of providing consulting and specialized investment services.

34.     Defendant Robert I. Schulman, a resident of the State of New York, is Tremont's Chairman Emeritus.  Schulman was president, Chief Executive Officer, and Chairman of Tremont's Board through 2006.  In or about 2007, Schulman became president and Chief Executive Officer of Rye Investment Management to focus on its build-out, until July 2008.

35.     Defendant Jim Mitchell is and was president and Chief Executive Officer of Rye Investment Management since July 2008.

### 3.     **The Auditor Defendants**

36.     Defendant Ernst & Young LLP ("E&Y") is a public accounting firm with headquarters in New York.  It is a member of and under the common control of Ernst & Young Global Limited ("EYG"), a UK private company Ernst & Young LLP located in the Cayman Islands, is believed to be under the common control of E&Y and EYG.

37.     Defendant KPMG LLP ("KPMG") is a public accounting firm with headquarters in New York and principal operations in New York.  It is a Delaware limited partnership.  It is the United States member of KPMG International located in Switzerland.  KPMG, located in Grand Cayman, Cayman Islands, is believed to be owned or controlled by KPMGLLP and/or KPMG International LLP.

38.     Both E&Y and KPMG provided auditing and other services to the funds at issue in this case between 2006 and 2008.

### 4.     **BNY**

39.     Defendant Bank of New York Mellon Corporation ("BNY") is a Delaware corporation, maintaining its principal place of business at One Wall Street, New York, New York.

40.     Through its subsidiary, defendant BNY Alternative Investment Services, Inc. at ("BNY Alternative"), BNY acted as the fund administrator for one or more of the Rye Funds.

**5.     SS&C Defendants**

41.     Defendant SS&C Technologies Holdings, Inc. ("SSC Technologies") is a Delaware corporation and maintains its principal place of business at Windsor, Connecticut.

42.     Defendant SS&C Fund Services is a division of SSC.

43.     Through SSC Fund Services, SSC Technologies provided professional fund administration, valuation and/or custodial services to one or more of the Rye funds at issue.

**6.     The Sub-Feeder Fund Defendants**

44.     Defendant Select Spectrum Partners LLC ("SSP"), a Florida limited liability company, is general partner and investment manager of one of the sub-feeder funds at issue in this litigation.

45.     Defendant FutureSelect Portfolio Management, Inc. ("FPM") is a Delaware Corporation with its principal place of business at 2316 216th Place, NE, Redmond, Washington.  FPM is operations manager of one of the sub-feeder funds at issue in this litigation.

46.     Defendant Ron Ward is the president and owner of FPM.  Ward controlled FPM and was directly responsible for managing the investment portfolio of one of those sub-feeder funds.

47.     Defendant Austin Capital Management, Ltd. ("Austin") is a Texas limited partnership with its principal offices at 5000 Plaza on the Lake, Suite 250, Austin, Texas.  Austin is the investment manager of one of the sub-feeder funds at issue in this litigation.

9

C.      __Nominal Defendants__

48.      Nominal Defendant Rye Select Broad Market Fund, L.P. ("Market Fund") at all relevant times was a limited partnership organized under the laws of the State of Delaware and maintained its principal place of business at 555 Theodore Fremd Avenue, Rye, New York.  Tremont Partners served as the Market Fund's general partner and investment manager.

49.      Nominal Defendant Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") at all relevant times was a limited partnership organized under the laws of the State of Delaware and maintained its principal place of business at 555 Theodore Fremd Avenue, Rye, New York.  Tremont Partners served as the Prime Fund's general partner and investment manager.

50.      Nominal Defendant Rye Select Broad Market XL Fund, L.P. ("XL Fund") at all relevant times was a limited partnership organized under the laws of the State of Delaware and maintained its principal place of business at 555 Theodore Fremd Avenue, Rye, New York.  Tremont Partners served as the XL Fund's general partner and investment manager.

51.      Nominal Defendant Rye Select Broad Market Portfolio Limited ("Market Portfolio") is a Cayman Islands exempted company, maintaining its principal place of business in the Cayman Islands.  Tremont Partners served as or controlled the Prime Fund's general partner and investment manager.

52.     Nominal Defendant Rye Select Broad Market XL Portfolio Limited ("XL Portfolio") is a Cayman Islands exempted company.  Tremont Partners served as or controlled the Prime Fund's general partner and investment manager.

53.     The Market Fund, Prime Fund, XL Fund, Market Portfolio and XL Portfolio (collectively, the "Rye Funds") each was a dedicated Madoff feeder fund through which plaintiffs' investments were funneled to Madoff.

54.     From in or about October 2001 through to the collapse of Madoff's Ponzi scheme in December 2008, the Rye Funds were an integral part of the MassMutual Financial Group.

55.     Nominal Defendant Spectrum Select L.P. ("Spectrum Select") is a Delaware limited partnership maintaining its principal place of business in Florida was formed on or about January 1, 2007 for the express purpose of investing with the Rye Funds.

56.     Nominal Defendant FutureSelect Prime Advisor II, LLC ("Future Select Prime") is a Delaware limited liability company and maintains its principal place of business at 2316 216th Place NE, Redmond, Virginia.  Substantially all of FutureSelect Prime's assets were invested through the Rye Funds.

57.     Nominal Defendant Austin Capital Safe Harbor ERISA Dedicated Fund, Ltd is an ERISA dedicated investment fund based in Texas.  It invested through the Rye Funds.

58.     Nominal Defendant Austin Safe Harbor Master Account, G.P. is a Texas general partnership maintaining its principal place of business in Texas.  Most or all of the Safe Harbor Fund assets were invested through the Austin Safe Harbor Master Account as part of Austin's master/feeder structure.

**D.     Non-Party Actors**

59.     Bernard L. Madoff at all relevant times was a resident of the State of New York.  He is now being held in federal custody awaiting sentencing for his lead role in the massive Ponzi scheme giving rise to this litigation.  Madoff faces up to 150 years in prison for his admitted crimes.

60.     At all relevant times, Bernard L. Madoff Investment Securities LLC ("BMIS") was a limited liability company organized under the laws of the State of New York and maintained its principal place of business at 885 Third Avenue, New York, New York.  Madoff at all relevant times controlled BMIS as its sole member and principal.

61.     BMIS is the firm through which Madoff orchestrated his Ponzi scheme and into which plaintiffs' investments were channeled and ultimately decimated.

62.     The following chart reflects the relationships between the defendants, plaintiffs and non-party actors identified above:



## IV.  FACTUAL BACKGROUND

**A.**  **Madoff's Ostensibly Legitimate**
      **Investment Advisory Business**

63.     From humble beginnings in the 1960s, Madoff built BMIS into what appeared to many to be a genuine Wall Street powerhouse.  BMIS was engaged in three lines of business:  market making, proprietary trading and investment advisory services.

64.     For decades, Madoff was widely known and highly respected in the Wall Street community for BMIS's trading activities as well as its role as a market maker.  But it was BMIS's investment advisory operation that garnered Madoff near legendary status in certain circles.

65.     With what appeared to be an impressive track record and substantial cachet, Madoff had high net-worth individuals and institutional investors clamoring to invest their money with BMIS either directly or indirectly.

66.     Madoff experienced extraordinary success marketing what he claimed was BMIS's split-strike conversion investment strategy.  BMIS purportedly invested in a basket of 35 to 50 common stocks within the Standard & Poor's 100 Index (the "S&P 100"), a collection of the 100 largest publicly traded companies in terms of their market capitalization.

67.     Madoff claimed that he would select a basket of stocks that would closely track the price movements of the S&P 100.  Madoff further claimed that he would opportunistically time those purchases, and would be "out of the market" intermittently.  When Madoff was "out of the market," investors were told, their funds would be invested in United States Government-issued securities such as United States Treasury bills.

68.     Madoff's investors also were told that Madoff would hedge the investments that he made in the basket of common stocks by using investor funds to buy and sell

14

options contracts related to those stocks, thereby limiting potential losses caused by
unpredictable fluctuations in stock prices.

69.     In theory, Madoff's purported strategy created a boundary on a stock's
price.  It theoretically limited an investor's upside but simultaneously shielded the investor from
precipitous price drops.  Such a market-neutral strategy typically does not produce stellar results
or result in crushing losses.  Instead, proponents of the strategy maintain that it typically
produces steady, respectable returns regardless of fluctuations in the market as a whole -- i.e.,
precisely the result Madoff claimed to be getting with his purported split-strike conversion
approach.

70.     The alleged split-strike conversion strategy earned Madoff a reputation
for having the Midas touch in both bull and bear markets.  He boasted an impressive track record
-- consistent annual gains of 10 to 12 percent, year after year and virtually without fluctuation.

**B.     The Rye Funds Served as the Conduit Through
Which Plaintiffs' Assets Were Funneled to Madoff**

71.     Madoff's apparently sterling track record lured thousands of investors
ranging from wealthy retirees to large pension funds, from Hollywood celebrities to respected
charitable organizations.

72.     The Rye Funds comprised one of the largest networks of feeder funds
that stoked Madoff's fraudulent scheme.

73.     The ties between Madoff and both Tremont Group and its predecessor,
Tremont Advisers, run long and deep.  Tremont Adviser's founder, Sandra L. Manzke, first
started investing and working with Madoff shortly after forming Tremont Advisers in 1984.

74.     Tremont Advisers' involvement with Madoff grew far more extensive,
however, when Robert I. Schulman, a high profile Wall Street veteran, joined the company in or

15

about 1994 as its president and chief operating officer.  That year, Tremont Advisers began marketing what would become its largest Madoff-dedicated fund.

75.     Throughout his tenure at Tremont Advisers and its successor entities, Schulman, who eventually was named the company's co-chief executive officer, consistently praised Madoff for his investing acumen and integrity and touted his close professional relationship with Madoff.

76.     Tremont Advisers and its successor entities, including Tremont Group, funneled their clients' assets to Madoff through five funds:  the Market Fund, Prime Fund, XL Fund, Market Portfolio and XL Portfolio.

## 1.     Rye Market Fund

77.     The Market Fund, formed in 1994, was the original Rye feeder fund dedicated to Madoff.  It also was the largest of those five funds.

78.     According to Rye Investment Management's promotional materials, the Market Fund allocated "substantially all of its assets to one manager who utilized a non-traditional investment strategy often described as a 'split-strike conversion.'"

79.     The promotional materials described this unidentified manager's strategy as consisting of "purchasing equity shares, buying related out-of-the money or at-the-money put options representing the same number of underlying shares, and selling related out-of-the-money call options which represents a number of underlying shares equal the number of shares purchased."

80.     Further, the promotional materials assured investors that the Market Fund "entrusts the management of its assets to investment advisors that have conservative investment styles and have demonstrated, over a prolonged period of time and under all economic and market conditions, their ability to achieve consistent results."

16

81.     The Market Fund required a minimum subscription of $500,000.00 and imposed a 1 percent management fee annually on all assets under management.

82.     All or substantially all of the Market Fund's assets were funneled into Madoff's scheme.

### 2.     Rye Prime Fund

83.     Rye Investment Management's promotional materials stated that the Prime Market's objective was to seek "long-term capital growth[.]"  According to these promotional materials, Tremont Partners, as general partner, "allocates the Fund's investment portfolio to advisors with conservative investment styles, demonstrated over a prolonged period of time and under all economic and market conditions, who have the ability to achieve consistent returns."

84.     Further, the promotional materials advised, the Prime Fund's "portfolio is currently invested in a 'split-strike synthetic conversion' options trading strategy."  That portfolio, the promotional materials stated, "generally consists of approximately 50 large-cap stocks that are hedged with equity index options."

85.     The Prime Fund, formed in 1997, required a minimum subscription of $500,000.00.  A management fee of 1.5 percent was imposed annually on all assets under management.

86.     Class Plaintiff the Lange Trust invested in the Prime Fund upon the advice of defendant Harry Hodges of Rye Investment Management.  As of December 2008, the Lange Trust had what it believed approximately $900,000 invested through the Prime Fund.

87.     Class Plaintiff Lange invested in the Prime Fund upon the advice of Hodges.  Lange had what he believed was approximately $2.1 million invested through the Prime Fund as of December 2008.

88.     Derivative Plaintiff Eastham Capital invested in the Prime Fund.

89.     All or substantially all of the Prime Fund's assets were funneled into Madoff's scheme.

### 3.     Rye XL Fund

90.     In its promotional materials, Rye Investment Management stated that the XL Fund's objective was to provide investors with "long-term capital growth and a return linked to a three times leveraged exposure to the economic performance" of the Market Fund. According to these promotional materials, Tremont Partners, as the general partner, intended to invest XL Fund's assets "in one or more swap transactions with one or more designated counterparties.  The counterparties will contract to provide to the Fund, the return referencing on 3 times investment in" the Market Fund.

91.     The promotional materials for the XL Fund stated that Tremont Partners may "from time to time, in its sole discretion, invest the Fund's assets directly in [the Market Fund] or in any other manner the General Partner believes is consistent with the investment objective."

92.     According to the private placement memorandum Rye Investment Management distributed to potential investors, Tremont Partners was "responsible for managing the day-to-day operations and investment management" of the XL Fund.

93.     Further, the private placement memorandum provided that Tremont Partners is accountable to the XL Fund "as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs."

94.     The limited partnership agreement governing the XL Fund provided that Tremont Partners "exercises ultimate authority" over the fund.

18

95.     The XL Fund, formed in 2006, required a minimum subscription of $500,000.00.  An "investor servicing fee" of up to 1 percent was imposed annually on all assets under management.

96.     Class Plaintiff the Lange Trust invested in the XL Fund upon the advice of Hodges.  The Lange Trust had what it believed was approximately $2 million invested through the XL Fund as of December 2008.

97.     All or substantially all of the XL Fund's assets were funneled into Madoff's scheme.

**4.     Rye Market Portfolio**

98.     Rye Select Broad Market Portfolio Limited is an open-ended investment company organized as an exempted company under the laws of the Cayman Islands on 23 August, 2001. The investment manger is Tremont (Bermuda) Limited, which is believed to be owned and/or controlled by Tremont Partners, Inc.  Tremont Partners is the sub-advisor and administrator.

99.     According to the private placement memorandum, "The Company has appointed Tremont Partners, Inc., located in New York (the 'Administrator'), as administrator of the Company under an Administration Agreement (the 'Administration Agreement').  The Administrator performs various administrative services for the Company, including Share issue and redemption services, calculation of the Net Asset Value of each respective Class of Shares on a monthly basis, or at any other point in time when a valuation is deemed necessary and appropriate, and act as registrar and transfer agent.  See 'MANAGEMENT -- The Administrator.' However, the Administrator with effect from July 1, 2007 has delegated substantially all of its duties in this regard to the Company's Bank, The Bank of New York, who will provide the

delegated duties through its Alternative Investment Services division, ('BNY-AIS') which will serve as the sub-administrator to the Company."

100.    Derivative Plaintiff NVP Positive invested in the Market Portfolio.

101.    All or substantially all of the Market Portfolio's assets were funneled into Madoff's scheme.

### 5.    Rye XL Portfolio

102.    Rye Select Broad Market XL Portfolio Limited, is a Cayman Islands exempted company which was incorporated with limited liability in the Cayman Islands on February 10, 2006.

103.    According to its Information Memorandum, "the Fund has retained Tremont Partners, Inc. to serve as investment manager to the Fund (the 'Investment Manager') pursuant to a management agreement (the 'Management Agreement') . . . The Investment Manager is an unregistered commodity pool operator and an unregistered commodity trading advisor that has filed for an exemption from registration pursuant to Rule 4.13(a)(4) and Rule 4.14(a)(8) of the Commodity Exchange Act, as amended (the 'CEA')."

104.    Also according to the Investment Memorandum, "The Fund has entered into an agreement (the 'Services Agreement') with BNY Alternative Investment Services, Inc. to provide administration services.  The Administrator performs various administrative services for the Fund, including calculation of the Net Asset Value (as defined herein) of the Shares on a monthly basis.  The Auditors in August 1, 2006 were Ernst & Young.  The auditors thereafter were KPMG."

C.       **MassMutual Targets Tremont As a Means of**
         **Expanding Into the Alternative Investments Arena**

105.     Defendant MassMutual has long boasted of its entrepreneurial culture. Indeed, in the early 2000s, Robert J. O'Connell, then MassMutual's chairman, consistently emphasized his objective to have at least one-third of his company's annual revenues generated from products and services not in existence three years earlier.

106.     In keeping with this entrepreneurial sprit, MassMutual, defendant OppenheimerFunds and other members of the MassMutual Financial Group determined in or about 2000 to accelerate their push into what was then the extraordinarily lucrative hedge fund arena.

107.     At the time, mutual funds were under increasing pressure to diversify their products.  As the equity markets declined, sophisticated investors were demanding access to alternative investments such as hedge funds and so-called funds of hedge funds, or funds of funds.

108.     In search of strategic acquisitions to help it achieve this objective, MassMutual, Oppenheimer Funds and other members of the MassMutual Financial Group set their sights on Tremont Advisers, Tremont Group's predecessor entity.  Defendant OAC was the MassMutual Financial Group entity designated to pursue a deal with Tremont Advisers.

109.     In or about early March 2001, OAC approached Tremont Advisers' financial advisor, Putnam Lovell Securities, Inc. ("Putnam Lovell"), and expressed "an interest in exploring a strategic transaction with Tremont," according to Tremont Advisers' Form DEFM14A filed with the SEC on or about August 20, 2001.

110.     As one of the early pioneers in the fund of funds sector, Tremont was an attractive target for MassMutual and the other members of the MassMutual Financial Group.

21

111.     MassMutual and the other members of the MassMutual Financial Group stood to benefit significantly from the acquisition of Tremont Advisers by virtue of, among other things, its access to Madoff.

112.     Indeed, Tremont Advisers' access to Madoff was one of its greatest selling points.  In its Form 10-K SB filed with the SEC just as OAC was making its initial approach in March 2001, Tremont Advisers stated that the Market Fund, Prime Fund and its other proprietary investment funds were designed "to provide clients with vehicles for investments with 'hard-to-access' managers."  Plainly, Madoff was the most prominent of these "hard-to-access" managers.

113.     Also highly attractive to Oppenheimer was the robust and growing revenue stream Tremont Advisers generated through fees assessed upon the flood of money flowing into its funds and then channeled to BMIS through the Rye Funds.  At the time it was approached by OAC, Tremont Advisers claimed to have been growing at a rate of 30 percent annually for three years running.

114.     In the first six months of 2001, Tremont Advisers' basic earnings per share increased 29.6 percent when compared with the first six months of 2000.  Its total revenue increased 32.8 percent over the first six months of 2000, according to the company's Form10QSB filed with the SEC on or about August 7, 2001.

115.     In the second quarter of 2001, Tremont Advisers experienced basic earnings per share growth of approximately 28.6 percent when compared with the second quarter of 2000.  Its total revenue increased 32.3 percent over the second quarter of 2000, according to its Form10QSB.

116.     Tremont Advisers attributed this growth primarily to "increased investor contributions into the Company's proprietary investment funds" such as the Rye Funds.

117.     Fees from Tremont Advisers' proprietary investment funds, including the Rye Funds, had increased 45.6 percent during the first six months of 2001 over the same period of 2000.  Those fees increased 46.6 percent in the second quarter of 2001 over the second quarter of 2000, according to the Form 10QSB.

118.     Tremont Advisers in its Form 10QSB added that it "continues to believe that its proprietary funds . . . will contribute significantly to future growth in earnings in future periods."

119.     The proposed deal with OAC was also attractive to Tremont Advisers. Among other things, it promised to afford Tremont Advisers the opportunity to market its products and services through MassMutual Financial Group's extensive global distribution network.

120.     The transaction also would permit Tremont Advisers -- a relative newcomer compared with MassMutual, which was founded in 1851 -- to operate alongside and with the imprimatur of such familiar, well established and trusted entities as OppenheimerFunds, MassMutual and the other well established components of the MassMutual Financial Group.

121.     Following OAC's initial approach to Putnam Lovell, a series of telephone discussions ensued between senior executives of OAC and Tremont Advisers "regarding the potential benefits of a transaction," according to the Form DEFM14A.

122.     These telephone calls were followed by a face-to-face meeting of senior management of Tremont Advisers and OAC in mid-March 2001.  Following this initial meeting, several follow up telephone calls and meetings took place between senior managers of Tremont

23

Advisers and MassMutual Financial Group's representatives at OAC.  These follow up discussions focused on clarifying "various aspects of Tremont's business operations," the assumptions underlying Tremont's financial projections and the "strategic fit between" Tremont and OAC, according to the Form DEFM14A.

### D. MassMutual's Due Diligence Into Tremont's Operations and Close Ties to Madoff

123.    After OAC and Tremont Advisers entered into a confidentiality agreement on or about March 14, 2001, OAC was provided with an "information package" that Putnam Lovell had prepared.  The package included, among other things, "a description of Tremont's various business lines, an overview of its investments and distribution platform, its strategic relationships, its distribution needs and its financial projections," according to the Form DEFM14A.

124.    Significantly, included in this package was Putnam Lovell's "analysis of the significant contribution to Tremont's revenues from a single relationship it has with an investment manager to its proprietary investment products[,]" according to the Form DEFM14A. This "single relationship" was Tremont Advisers' critical relationship with Madoff.

125.    Thus, at the very outset of the transaction, the issue of Tremont Advisers' close and highly lucrative relationship with Madoff was placed squarely before OAC and its affiliated entities in the MassMutual Financial Group.

126.    On or about April 27, 2001, OAC submitted to Tremont Advisers a written "preliminary indication of interest" signaling that it valued Tremont Advisers at between $100 million and $140 million.

127.    Over the latter half of May 2001, OAC held extensive meetings with Tremont Advisers to discuss "various business function areas, such as sales and marketing, accounting and administration and manager research," according to the Form DEFM14A.

128.    Also during the latter half of May 2001, OAC representatives conducted extensive due diligence in Tremont Advisers' data room, according to the Form DEFM14A.

129.    On or about May 21, 2001, Putnam Lovell and Tremont Advisers' counsel at Skadden Arps forwarded a draft merger agreement to OAC along with a "protocol letter" inviting OAC to submit a final proposal to acquire Tremont Advisers.

130.    From late May into early June 2001, the senior management of Tremont Advisers along with representatives of Putnam Lovell continued to work closely with senior OAC executives who were continuing their due diligence -- a painstaking, deliberate process then entering its third month.

131.    The due diligence conducted by OAC focused in substantial part on Tremont Advisers' business dealings with Madoff and BMIS, as well as Madoff's investment strategy and the overall nature of BMIS's operations.

132.    By mid-June 2001, OAC had completed its due diligence, according to the Form DEFM14A.

133.    As a consequence of their due diligence and through other available sources, MassMutual, OAC, OppenheimerFunds and the other members of the MassMutual Financial Group were aware as early as the spring of 2001 of numerous "red flags" or indicators of gross irregularities in Madoff's operations.

134.    In addition to this due diligence, at the time OAC was pursuing Tremont Advisers, sophisticated players within the investment community who were not involved in the

Tremont Advisers transaction already had begun to publicly express skepticism regarding the legitimacy of Madoff's operations.

135.    For example, in May 2001 -- at the height of OAC's due diligence inquiry -- an article entitled "Madoff Tops Charts; Skeptics Ask How" was published in MAR/Hedge, a newsletter covering the hedge fund industry.

136.    Noting the consistently positive returns Madoff claimed to have earned for his investors over the years, the MAR/Hedge article reported that numerous traders, money managers and fund managers employing a split-strike conversion strategy experienced far greater volatility and more meager returns than Madoff was reporting with respect to what he claimed was his split strike conversion strategy.  In other words, the article highlighted the fact that Madoff's track record could not be replicated by others employing the same investment strategy he claimed to be utilizing.

137.    In addition, on or about May 7, 2001 -- again, at the height of OAC's due diligence inquiry -- an article entitled "Don't Ask, Don't Tell:  Bernie Madoff Is So Secretive, He Even Asks His Investors to Keep Mum" was published in Barrons.  This article reported that three option strategists at major investment banks were highly skeptical about the unusually steady double-digit returns Madoff claimed were flowing from his split-strike conversion strategy.

138.    The Barrons article quoted a former Madoff investor as stating:

> Anybody who's a seasoned hedge-fund investor
> knows the split-strike conversion is not the whole
> story.  To take it at face value is a bit naïve.

139.    Notwithstanding their knowledge of Tremont Advisers' close relationship with Madoff, the nature of Madoff's operations and the skepticism other sophisticated entities were expressing publicly with respect to Madoff's alleged investment

strategy, executives at the highest levels of MassMutual, OAC and other MassMutual Financial Group entities determined to press forward with the Tremont Advisers acquisition.

140. On or about June 8, 2001, OAC submitted a formal proposal to acquire all of Tremont Advisers' outstanding common stock for $18.25 per share, according to the Form DEFM14A.

141. Neither its own due diligence into Madoff's operations nor the increasing skepticism being voiced about his purported investment strategy could dampen OAC's drive to acquire Tremont Advisers.

142. Indeed, on or about June 25, 2001, OAC sweetened its initial proposal and offered to acquire Tremont Advisers at $19.00 per share, according to the Form DEFM14A.

143. On or about June 27, 2001, Tremont Advisers' board of directors authorized senior management to conclude their negotiations with OAC.

144. On or about July 9, 2001, Tremont Advisers' board unanimously approved the proposed transaction and the final terms of the deal were finalized early the next day.

E.   **MassMutual Welcomes Tremont Into the Fold**

145. OAC's plan to acquire Tremont Advisers for in excess of $145 million was publicly announced on or about July 10, 2001. The merger agreement provided that the acquisition price was to be financed by OAC through cash on hand and, if needed, capital contributions from its ultimate parent, MassMutual.

146. Tellingly, the press release Tremont Advisers issued on July 10, 2001 regarding the acquisition was entitled "Tremont Advisers Reaches Agreement to Be Purchased by OppenheimerFunds" rather than OAC.

147.    In announcing the planned transaction, John V. Murphy,

OppenheimerFunds' chief executive officer, stated:

> There is growing interest among high net worth
> investors and institutions alike in hedge funds and
> other alternative investment products that seek to
> provide positive returns regardless of the direction
> of the stock markets.  This transaction brings
> together a recognized leader in alternative
> investment management with one of the nation's
> premier managers and distributors of investment
> products.  The synergies are considerable.

148.    Murphy further stated:

> Tremont's unique product offerings, in combination
> with our distribution network, will open the world
> of alternative investing to a now segment of
> investors.  This transaction underscores our
> commitment to providing the right investment
> products for our clients.

149.    In announcing the planned acquisition, O. Leonard Darling, vice

chairman and chief investment officer of OppenheimerFunds, stated:

> [Tremont's] superior product expertise and industry
> experience will enable us to enhance and expand
> our alternative products offerings for high net worth
> and institutional clients alike.

150.    Commenting on the anticipated acquisition, Kurt Wolfgruber, director of

the domestic equity mutual fund business at OppenheimerFunds, stated:

> Tremont fits perfectly with our goal of extending
> both our product line and our client base.  Our
> clients have been asking for hedge funds more
> frequently.

151.    Tremont Advisers' senior managers struck a similar tone regarding the

transaction.  Schulman, Tremont's co-chief executive officer, stated:

> Our alliance with Oppenheimer Funds is an
> excellent strategic fit that brings together Tremont's

28

> capabilities in creating alternate investment
> products with Oppenheimer's strong financial
> intermediary relationships and unparalleled
> distribution talents.

152.     Sandra L. Manzke, Tremont's co-chief executive officer, stated:

> We couldn't imagine a better fit, culturally or
> strategically, than OppenheimerFunds.  This
> combination with OppenheimerFunds and
> MassMutual will allow us to enhance our
> capabilities and expand distribution.  We think this
> is the right combination at the right time.

153.     Manzke continued:

> Working together, we have an unparalleled
> opportunity to tap the high-net worth and
> institutional market and add a significant growth
> rate to an already rapidly growing business.

154.     The announcement of the Tremont Advisers deal came just as

OppenheimerFunds was publicly acknowledging its push into the hedge fund arena.

Immediately after being named OppenheimerFund's chief executive officer in July 2001, for

example, Murphy of OppenheimerFunds stated in the <u>Financial</u> <u>Times</u> that one of his top

priorities would be to expand aggressively into the hedge fund arena -- a sector that had been

Tremont Advisers' bailiwick for years.

**F.     MassMutual's Extensive Control**
**Over Tremont's Rye Funds**

155.     OAC's acquisition of Tremont Advisers closed on or about October 1,

2001.  From that point forward, Tremont Advisers' operations -- including the marketing and

investment activities of the Rye Funds -- were brought directly under the MassMutual Financial

Group umbrella.

156.     By virtue of the acquisition, Tremont Advisers became a wholly owned

direct subsidiary of OAC.

157.     In addition, Tremont Advisers' management structure was overhauled to reflect MassMutual, OAC and OppenheimerFunds' deep involvement in and control over its operations.

### 1.     Control of Tremont Advisers

158.     At the time of the transaction, Tremont Advisers' board consisted of five members, according to Tremont Advisers' 2001 Annual Franchise Tax Report filed with the State of Delaware.  All five of those directors had direct ties to MassMutual and/or an Oppenheimer entity.

159.     Specifically, as part of the acquisition, Murphy, the chairman, chief executive officer and president of OppenheimerFunds, was named a director of Tremont Advisers.  Murphy also held the position of executive vice president at MassMutual and was a director of OAC.

160.     Joining Murphy on Tremont Advisers' restructured board of directors was Kurt Wolfgruber.  Wolfgruber served as management director and the assistant treasurer of OAC.  He also served as the president, chief investment officer and director of OppenheimerFunds.

161.     In addition to Murphy and Wolfgruber, Howard E. Gunton, an executive vice president and the chief financial officer of MassMutual, was named to Tremont Advisers' board.  Gunton also served as a director of OAC.

162.     Further, as part of the acquisition, Manzke and Schulman, Tremont Advisers' co-chief executive officers and board members, became employees of OppenheimerFunds, according to the Form DEFM14A Tremont Advisers filed with the SEC on or about August 20, 2001.

163.     Their employment contracts provided that Manzke and Schulman would continue to serve as co-chief executives "or in other positions to which they may be appointed from time to time" by OppenheimerFunds.  Further, the agreements provided for OppenheimerFunds to pay Manzke and Schulman annual base salaries of $500,000.00 plus potentially substantial discretionary bonuses.

164.     Subsequent to the Tremont Advisers transaction, Michael Rollings, the chief financial officer and an executive vice president at MassMutual, was named to Tremont Advisers' board of directors.

165.     By the time Rollings joined as a director in or about 2006, Tremont Advisers' board consisted of four members:  Murphy, Wolfgruber, Schulman and Rollings, according to Tremont Advisers' Annual Franchise Tax Report for 2007 filed with the State of Delaware.  As noted above, each of those four directors held senior positions with MassMutual and/or an Oppenheimer entity.

166.     By 2008, Tremont Advisers' board consisted of three members, according to Tremont's Annual Franchise Tax Report for 2008 filed with the State of Delaware. Each of these directors -- Murphy, Wolfgruber and Rollings -- was a high-level executive and/or director of entities operating within the MassMutual Financial Group network as noted above.

167.     The degree to which MassMutual and Oppenheimer entities assumed control of the management of Tremont Advisers is reflected in the following chart:

31



2.     **Control of OAC**

168.     At the time of the Tremont Advisers acquisition, MassMutual also had total control over OAC, Tremont Advisers' direct corporate parent.  O'Connell, then MassMutual's chairman, president and chief executive officer, served as OAC's chairman, according to the Form SC 13D MassMutual filed with the SEC on or about July 20, 2001.

169.     Murphy, an executive vice president of MassMutual, as well as the chairman, president and chief executive officer of OppenheimerFunds, also served on OAC's board, according to MassMutual's Form SC 13D.

170.     In addition, Ann F. Lomeli, senior vice president, secretary and deputy general counsel of MassMutual, served on OAC's board, according to MassMutual's Form SC 13D.

171.     Also serving on OAC's board was Stuart H. Reese, an executive vice president and the chief investment officer of MassMutual, according to MassMutual's Form SC 13D.

172.     In addition, Lawrence V. Burkett, Jr., an executive vice president and the general counsel of MassMutual, served on OAC's board, according to MassMutual's Form SC 13D.

173.     Howard E. Gunton, an executive vice president and the chief financial officer of MassMutual, also served on OAC's board, according to MassMutual's Form SC 13D.

174.    The remaining two members of OAC's board of directors at or about the time of the Tremont Advisers' acquisition were O. Leonard Darling and Jeremy Griffiths. Darling was the chief investment officer and an executive vice president of OppenheimerFunds.

175.    Griffiths, who also served as OAC's chief financial officer and treasurer, was the chief financial officer and an executive vice president of OppenheimerFunds, according to MassMutual's Form SC 13D.

176.    In addition, OAC's top executives at or about the time of the Tremont Advisers transaction had direct ties to MassMutual and Oppenheimer Funds.  Andrew J. Donohue, OAC's general counsel and secretary, was an executive vice president and the general counsel of OppenheimerFunds, according to MassMutual's Form SC 13D.

177.    Brian W. Wixted, OAC's assistant treasurer, was a senior vice president and the treasurer of OppenheimerFunds, according to MassMutual's Form SC 13D.

178.    Further, Stephen L. Kuhn, OAC's assistant secretary, was senior vice president, deputy general counsel and assistant secretary of MassMutual, according to MassMutual's Form SC 13D.

179.    The degree to which MassMutual controlled OAC -- the corporate parent of Tremont Advisers -- at the time of the Tremont Advisers deal and thereafter is reflected in the chart below:



3.      **Control of MassMutual Holding**

180.     MassMutual Holding, the corporate parent of the Oppenheimer entity that acquired Tremont Advisers, also was dominated by top-level MassMutual executives at or about the time of the Tremont Advisers acquisition.

181.     MassMutual Holding's then chairman, president and chief executive officer, Robert J. O'Connell, held those same positions with MassMutual at the time, according to MassMutual's Form SC 13D.

182.     Lawrence V. Burkett, Jr., a director and executive vice president of MassMutual Holding, served as an executive vice president and the general counsel of MassMutual, according to MassMutual's Form SC 13D.

183.     Howard E. Gunton, a director, vice president and the chief financial officer of MassMutual Holding, was an executive vice president and the chief financial officer of MassMutual, according to MassMutual's Form SC 13D.

184.     MassMutual Holding director Margaret Sperry was a senior vice president and the chief compliance officer of MassMutual, according to MassMutual's Form SC 13D.

185.     In addition, Ann F. Lomeli, a director, senior vice present and the secretary of MassMutual Holding, held the titles of senior vice president, secretary and deputy general counsel at MassMutual, according to MassMutual's Form SC 13D.

186.     Stuart H. Reese, an executive vice president of MassMutual Holding, served as the executive vice president and the chief investment officer of MassMutual, according to MassMutual's Form SC 13D.

187.     Christine Modie, an executive vice president of MassMutual Holding, was an executive vice president and the chief information officer of MassMutual, according to MassMutual's Form SC 13D.

188.     Murphy, an executive vice president with MassMutual, served as an executive vice president of MassMutual Holding.

189.     Susan A. Alfano, an executive vice president of MassMutual Holding, held that same title with MassMutual, according to MassMutual's Form SC 13D.

190.     Matthew E. Winter, a MassMutual Holding executive vice president, held the same title at MassMutual, according to MassMutual's Form SC 13D.

191.     Finally, Edward M. Kline, vice president and treasurer of MassMutual Holding, held those same positions at MassMutual, according to MassMutual's Form SC 13D.

192.     The degree to which MassMutual controlled MassMutual Holding -- the corporate parent of the entity that negotiated with and acquired Tremont Advisers on behalf of the MassMutual Financial Group -- at the time of the Tremont Advisers transaction and thereafter is reflected in the chart set forth below:



4.      **Control of Tremont
         Partners and the Rye Funds**

193.     MassMutual Financial Group's influence and control extended all the way down the corporate chain to Tremont Partners, the general partner of each of the Rye Funds. Among other things, Lynn Oberist Keeshan, who served over the years as a senior vice president of OppenheimerFunds, served as Tremont Partners' chief financial officer and a senior vice president in 2005 and a senior vice president in 2006 and 2007.

194.     In addition, Margaret Weaver, an OppenheimerFunds employee, served as a senior vice president of Tremont Partners and was described as a member of the "Tremont management team[]" on Tremont Advisers' website.

195.     So extensive was the influence that MassMutual, OAC and OppenheimerFunds exercised over Tremont Advisers and its operations that those entities were listed as "control persons" of Tremont on Tremont Partners' Uniform Application for Investment Advisors Registration filed with the SEC.

196.     This close relationship between Tremont Advisers and its successor entities and MassMutual's network of subsidiaries and affiliates was reflected in the day-to-day operations of the Rye Funds themselves.  For example, responding to questions regarding its disaster recovery capabilities in a 2006 Due Diligence Questionnaire for investors and potential investors in the Prime Fund, Tremont Partners stated:

> Tremont Group, in coordination with
> OppenheimerFunds, Inc., is continually reviewing
> and updating the company's contingency plans with
> respect to computer systems, facilities and back-up
> systems.

197.     The close working relationship Tremont Group and its predecessors had with MassMutual Financial Group over the years is reflected even in such mundane operational

39

matters as employee hiring.  During the relevant time period, the OppenheimerFunds'

employment application listed Tremont Group as one of six entities included under the umbrella

of "OppenheimerFunds, Inc. and its subsidiaries and affiliates[.]"

> **G.**    **Tremont Is Marketed as a Member of the**
> **MassMutual Family of Companies**

198.    Not only did MassMutual and the Oppenheimer entities position

themselves to control, influence and closely monitor Tremont Advisers' business operations, but

they also jointly marketed Tremont's capabilities.  Throughout these joint marketing efforts,

Tremont Advisers and its funds consistently were portrayed as being a part of the network of

subsidiaries and affiliates that comprised the MassMutual Financial Group.

199.    Through this coordinated marketing campaign, MassMutual,

MassMutual Holding, OAC and OppenheimerFunds provided substantial assistance to Tremont

Advisers and its successors, as well as Tremont Partners in the marketing of the Rye Funds.

200.    Tremont Advisers and Tremont Partners, with the knowledge and

approval of executives at the very highest levels of the MassMutual Financial Group entities,

consistently sought to leverage their relationship with those well established and well regarded

entities in order to maximize efforts to attract investors to the Rye Funds.

201.    For example, with the knowledge and approval of MassMutual,

Oppenheimer Funds and other MassMutual Financial Group members, the phrase "An

OppenheimerFunds Company" began to appear on Tremont Advisers' stationery, publications

and marketing materials after the Tremont Advisers acquisition.

202.    Further, in a Due Diligence Questionnaire dated June 30, 2006 and

completed for the benefit of investors and prospective investors in the Prime Fund, Tremont

Partners stated:

> Through its ownership by Oppenheimer Acquisition
> Corp., Tremont Group is affiliated with
> OppenheimerFunds, Inc. and other MassMutual
> Financial Group affiliates[.]

203.    In this same questionnaire, Tremont Partners responded to queries

regarding its ownership structure by referencing, among other things, its ties to both

OppenheimerFunds, which it touted as "one of America's largest and most respected asset

management companies with over $215 billion in assets," and MassMutual, an entity Tremont

Partners boasted of having "$395 billion in assets under management[.]"

204.    Further, Tremont Advisers' privacy policy, which was attached to the

offering materials issued in connection with its funds, stated that:

> Tremont is made up of certain entities, including its
> investment advisory and broker-dealer subsidiaries,
> and, in turn, is part of a larger corporate affiliation
> owned by the OppenheimerFunds group and
> Massachusetts Mutual Life Insurance Company.
> The Tremont entities and, in some cases, its
> ownership affiliates often work together to provide
> the financial products and services offered to
> Tremont clients.

205.    As part of this joint marketing effort, the Oppenheimer entities actively

promoted Tremont's capabilities to the investment community, stating:

> In the world of hedge funds, where information is
> more difficult to obtain than in more conventional
> financial arenas, Tremont is a name that commands
> respect.  Founded in 1984, Tremont is a global
> leader in the hedge fund industry.

206.    Oppenheimer also emphasized Tremont's expertise in managing other

fund managers:

> Tremont's history and manager expertise bring a
> strong investment team to the table to work for you.
> Because of their 'hedge fund of funds' approach,

41

> Tremont's team has extensive experience managing
> other fund managers.

207.    Further, Oppenheimer permitted its name to be used in connection with several Tremont funds.  For example, shortly after the Tremont Advisers deal closed, Tremont and OppenheimerFunds launched the "Oppenheimer Tremont Market Neutral Fund LLC" and "Oppenheimer Tremont Opportunity Fund LLC."  Tremont Partners served as the funds' investment adviser and OppenheimerFunds handled fund distribution.

208.    Over the years, this family of OppenheimerFunds-Tremont funds continued to expand.  In its Uniform Application for Investment Adviser Registration dated March 31, 2006, Tremont Partners stated that it was the sub-advisor or investment manager for the following funds advised by OppenheimerFunds:  Oppenheimer Tremont Opportunity Fund LLC, Oppenheimer Tremont Market Fund LLC, OFI Tremont Core Strategic Hedge Fund and OFI Tremont Market Neutral Hedge Fund.

209.    The close relationship between OppenheimerFunds and Tremont Group and its predecessors is also reflected in OppenheimerFunds' Broker-Dealer Questionnaire. Therein, firms are thanked for "choosing to do business with OppenheimerFunds."  Further, "in preparation for joining our distribution firms," candidates were asked "[w]hich OppenheimerFunds agreement are you requesting" and given the choice of "Oppenheimer Retail Mutual Funds" and/or "Oppenheimer Tremont Hedge Fund Series."

210.    Similarly, as part of this joint marketing effort coordinated within the MassMutual Financial Group, MassMutual itself held Tremont Advisers, along with its subsidiaries, affiliates and funds, out to be a part of its overall corporate organization.  For example, in the discussion of its asset management business in its 2002 and 2003 Annual

Reports, MassMutual specifically referenced certain of Tremont's funds in connection with its

overview of the performance of the OppenheimerFunds.

211.    In its 2005 Annual Report, MassMutual listed Tremont Capital

Management Ltd. as one of its "General Agencies and Other Offices."  This Tremont entity was

so listed following an introductory passage reading:  "Massachusetts Mutual Life Insurance

Company and its subsidiaries have offices around the globe.  Listed here are our general

agencies, disability income insurance sales offices, retirement services office, and international

locations."

212.    In its Annual Report for 2006, 2007 and 2008, MassMutual listed

Tremont Group itself as one of its "General Agencies and Other Offices."  Again, Tremont

Group was listed following an introduction passage reading:  "Massachusetts Mutual Life

Insurance Company and its subsidiaries have offices around the globe.  Listed here are our

general agencies, disability income insurance sales offices, retirement services offices, and

international locations."

**H.    Madoff's "Giant Ponzi Scheme" Implodes**

213.    From the time of its acquisition by OAC in 2001 through to December

2008, Tremont Group and its predecessor entities, through the Rye Funds, continued to pump

enormous waves of their funds into Madoff's hands and continued to pocket correspondingly

enormous fees for doing so.  They did so with the full knowledge, approval and substantial

assistance of MassMutual, OAC, OppenheimerFunds and other members of the MassMutual

Financial Group.

214.    The revenue stream flowing from the Rye Funds' operations was

substantial and benefitted all participants up and down the corporate chain within the

43

MassMutual Financial Group. By early December 2008, however, this gravy train would come to a dead stop.

215.    In early December 2008, Madoff confided to two senior BMIS employees (believed to be his sons) that he recently had received demands from clients for approximately $7 billion in redemptions. BMIS's security advisory business, Madoff told them, was on the verge of imploding.

216.    Madoff's comments regarding the precarious financial condition of BMIS concerned these employees, who later told investigators that they believed the firm had assets under management of approximately $8 to 15 billion. Indeed, the Form ADV Madoff filed on BMIS's behalf with the SEC on January 7, 2008 stated that BMIS had approximately $17.1 billion in assets under management.

217.    On or about December 10, 2008, the two senior BMIS employees again met with Madoff at the offices of BMIS to discuss the firm's condition. When these employees pressed Madoff for details, Madoff said that he did not want to talk at the office; instead, he arranged a meeting for later that day at his penthouse apartment in Manhattan.

218.    At the later meeting, Madoff allegedly came clean and informed the two senior employees that his investment advisory business was a fraud. Madoff stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme."

219.    Madoff told the senior employees that he had for years been paying returns to certain investors out of the principal received from other investors. Madoff stated that the business was insolvent, and had been for years. Madoff placed the losses attributable to his scheme at approximately $50 billion.

220.     Following this meeting at Madoff's penthouse, at least one of the two senior BMIS employees is believed to have contacted federal authorities.

221.     The following day, December 11, 2008, Special Agents of the Federal Bureau of Investigation confronted Madoff at his residence.  Madoff immediately acknowledged that he knew why the agents had contacted him.

222.     When the FBI agents inquired as to whether there was an "innocent explanation" for reports that he had been operating a massive Ponzi scheme, Madoff responded, "There is no innocent explanation."

223.     Madoff admitted to the FBI agents that for years he had operated a Ponzi scheme in which he "paid investors with money that wasn't there."

224.     In the end, Madoff was undone by the same economic downturn affecting investors worldwide.  With the world economy in tatters, increasing numbers of Madoff's investors were seeking to withdraw assets from BMIS.  Madoff ultimately was unable to accommodate both the wave of redemptions and the pressure of maintaining the fictitious returns that had attracted investors for decades.

225.     In essence, when the economic downturn made it impossible for Madoff to attract a sufficient flow of fresh investors to both cover increasing redemptions and continue paying bogus returns to older investors, his scam had reached a dead end.

I.     **Madoff Is Arrested**

226.     Madoff was arrested on December 11, 2008 and charged with securities fraud.  In a criminal information filed in connection with his arrest, law enforcement authorities maintained that in order to sustain his "massive Ponzi scheme," Madoff had created "a broad infrastructure at [BMIS] to generate the impression and support the appearance that [BMIS] was

operating a legitimate investment advisory business in which client funds actively traded as he had promised, and to conceal the fact that no such business was actually being conducted."

227.    Among other things, Madoff "hired numerous employees -- many of whom had little or no prior pertinent training or experience in the securities industry -- to serve as a 'back office' for this investment advisory business" according to the criminal information.

228.    Federal authorities charged that Madoff instructed his back office staff to communicate with BMIS clients and generate "false and fraudulent documents" relating to BMIS's activities.

229.    Also on December 11, 2008, the SEC brought an emergency action to halt "ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BMIS."  The SEC alleged that Madoff and BMIS "have been defrauding investment advisory clients by conducting a Ponzi scheme by paying returns to certain investors out of principal received from other investors[.]"

**J.    Madoff Pleads Guilty**

230.    On March 12, 2009, Madoff pleaded guilty to, among other things, securities fraud, perjury and money laundering.  Madoff admitted that despite promises to clients and prospective clients that he would invest their money in shares of common stock, options and other securities of well known corporations, in fact he had never invested those client funds.

231.    In pleading guilty, Madoff stated under oath that "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business[.]"

232.    Madoff continued:

> As I engaged in my fraud, I knew what I was doing
> was wrong, indeed criminal.  When I began the
> Ponzi scheme I believed it would end shortly and I

46

would be able to extricate myself and my clients
from the scheme.  However, this proved difficult,
and ultimately impossible, and as the years went by
I realized that my arrest and this day would
inevitably come.

233.    Madoff outlined the "essence of my scheme" as follows:

I represented to clients and prospective clients who
wished to open investment advisory and individual
trading accounts with me that I would invest their
money in shares of common stock, options and
other securities of large well-known corporations,
and upon request, would return to them their profits
and principal.  Those representations were false for
many years.  Up until I was arrested on December
11, 2008, I never invested these funds in the
securities, as I had promised.  Instead, those funds
were deposited in a bank account at Chase
Manhattan Bank.  When clients wished to receive
the profits they believed they had earned with me or
to redeem their principal, I used the money in the
Chase Manhattan bank account that belonged to
them or other clients to pay the requested funds.

234.    BMIS's split-strike conversion strategy, Madoff told the court, was a

ruse.  "In fact," he stated, "I never made those investments I promised clients, who believed they

were invested with me in the split-strike conversion strategy."

**K.    The Devastation Wrought by Madoff's Scheme**

235.    The damage inflicted by Madoff's scheme was international in scope and

catastrophic in magnitude.

236.    At the time of Madoff's arrest, the Rye Funds claimed to have had in

excess of $3 billion invested with Madoff through the Rye Funds.  It was all wiped out.

237.    On or about December 19, 2008, Tremont Partners advised investors in

the Rye Funds that all or substantially all of the assets invested in those funds had been held by

47

Madoff and BMIS.  Under the circumstances, investors were advised, the determination of the

Rye Funds' net asset values was suspended, as were any withdrawals from the funds.

238.    The Lange Trust lost approximately $2.9 million to Madoff's Ponzi

scheme.

239.    Lange lost approximately $2.1 million to Madoff's Ponzi scheme.

240.    Reeling from its shameful missteps in connection with the Madoff

scandal, Tremont Group shuttered its Rye Investment Management division on or about January

26, 2009.

L.    **The Defendants Recklessly Overlooked or Ignored a**
      **Host of Red Flag Warnings Regarding Madoff's Scheme**

241.    Prior to Madoff's arrest, neither Tremont Group and its predecessors nor

Tremont Partners gave the slightest indication that anything was amiss with respect to their

investments through the Rye Funds.

242.    As a result, revelations of Madoff's scheme and BMIS's implosion

completely sandbagged the Rye Funds' investors.  The same cannot be said of the defendants

here.  They either knew or certainly should have known of the criminality and/or gross

irregularities in Madoff's operations.  They either recklessly overlooked or ignored numerous red

flag warnings that something was wrong in Madoff's operations and, as a result, took no action

to protect the interests of the Rye Funds' investors.

243.    The senior personnel at Tremont Group and its predecessors, as well as

Tremont Partners, were all sophisticated investment professionals fully capable of detecting the

irregularities in Madoff's operations had they not been so deeply incentivized to either look the

other way or ignore the red flag warnings of Madoff's fraudulent scheme.

244.    Moreover, given their size, reputation, relationship with the influential MassMutual Financial Group and status as one of Madoff's largest family of feeder funds, Tremont Group and its predecessors, as well as Tremont Partners, had the wherewithal to insist upon transparency and heightened access to the inner workings of BMIS had they wished to.

245.    Despite all of these factors, Tremont Group and its predecessors, as well as Tremont Partners, either recklessly failed to detect the criminality and/or gross irregularities in Madoff's operations or they elected to ignore clear warnings of Madoff's criminal enterprise for fear of jeopardizing the rich flow of fees their relationship with Madoff had generated for years.

246.    The red flags regarding Madoff's operations were so prominent and so plentiful that no entity with the size and sophistication of Tremont Group and its predecessors, as well as Tremont Partners, could possibly have missed those warning signs had they only made a good faith effort to protect their clients' interests rather than advance their own self-interests.

247.    The red flags regarding the criminality and/or gross irregularities in Madoff's operations included the following:

**1.      Returns Too Consistently Good to Be True**

248.    One critically important red flag recklessly overlooked or ignored was the bait that lured many investors to Madoff in the first instance -- his purported track record of securing consistently solid returns, year after year virtually without interruption.

249.    Madoff's purported track record was simply too good to be credited by sophisticated investment professionals.  This track record not only was implausible but, as Madoff admitted in pleading guilty to his crimes, it was a complete and utter fiction.

250.    Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to detect this indication of potential criminality and/or gross irregularities in Madoff's operations or simply chose to ignore it.

49

### 2.    BMIS's Auditing Firm
### <u>Was Plainly Unqualified</u>

251.    One of the most glaring red flags regarding Madoff's criminal scheme was the identity and nature of BMIS's auditing firm.  Industry custom and practice dictated that an operation of BMIS's purported magnitude should have been audited by a national or large regional auditing firm.  This, however, was not the case -- and Madoff made absolutely no attempt to hide it.

252.    From approximately 1991 through 2008, BMIS's auditor, Friehling & Horowitz CPAs, P.C. ("F&H"), operated out of a 13-foot by 18-foot storefront office in New City, New York.

253.    The firm plainly lacked the depth and expertise necessary to adequately audit BMIS's operations.  One of Friehling & Horowitz's two professionals was 78 years old and lived in Florida in apparent retirement.  The second professional was David G. Friehling, the firm's principal.  Friehling has been charged criminally with conducting sham audits that allowed Madoff to maintain his criminal scheme.  The only other F&H employee was a secretary.

254.    In a complaint filed in connection with Friehling's arrest, the FBI alleged that F&H's work papers and audit documents maintained by BMIS from 1998 to 2008 demonstrated that Friehling failed to conduct an independent verification of BMIS's assets; failed to review material sources of BMIS's revenue; failed to examine a bank account through which "billions of dollars of [BMIS] client funds flowed"; failed to verify liabilities related to BMIS's client accounts; and failed to verify the purchase and custody of securities by BMIS.

255.     In addition, the SEC has asserted securities fraud claims against Friehling

and F&H.  In its complaint, the SEC alleges that Friehling and F&H "enabled Madoff's

misconduct by falsely representing to investors that BMIS was financially sound[.]"

256.     The SEC in its complaint alleges:

> Friehling and F&H did not perform anything
> remotely resembling an audit of BMIS and,
> critically, did not perform procedures to confirm
> that the securities BMIS purportedly held on behalf
> of its customers even existed.  Instead, Friehling
> merely pretended to conduct minimal audit
> procedures of certain accounts to make it seem like
> he was conducting an audit[.]

257.     The SEC further alleges:

> If properly stated,  [BMIS's] financial statements,
> along with BMIS's related disclosures regarding
> reserve requirements, would have shown that BMIS
> owed tens of billions of dollars in additional
> liabilities to its customers and thus was insolvent.

258.     Madoff claimed that BMIS had approximately 4,800 client accounts.

BMIS issued account statements for November 2008 reflecting that those accounts held balances

totaling approximately $64.8 billion.  Even if Madoff's claims were assumed to be true (which

they were not), F&H indisputably was not in a position to adequately audit an operation of that

alleged magnitude.

259.     F&H's inadequacies were apparent for years.  They were easily verified.

Yet Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to

detect this warning sign of criminality and/or gross potential irregularities in Madoff's operations

or simply chose to ignore it.

### 3.   Skepticism in the Financial Press
### Regarding Madoff's Operations

260.     By 2001 speculation in the financial press was intensifying with respect to the legitimacy of Madoff's operations, as noted above.  These articles reported that the results Madoff claimed to have garnered through his split-strike conversion strategy could not be replicated by experts.

261.     With this speculation appearing in such highly respected publications as Barrons, the questions regarding Madoff's operations received widespread circulation among sophisticated investment firms.  The articles triggered consistent speculation among sophisticated investment firms and banks regarding the legitimacy of Madoff's operations.

262.     Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to take notice of these questions regarding Madoff's operations or chose to ignore them.

### 4.   Madoff's Investment Strategy
### Had No Basis in Reality

263.     Another recklessly overlooked or ignored red flag was the fact that Madoff's claimed split-strike conversion strategy was, in essence, an impossibility in terms of market realities.  If Madoff had actually utilized this strategy, BMIS would have been required to have a greater number of option contracts than were actually traded in the market as a whole.

264.     Given the extraordinary volume of assets Madoff claimed to have under management, there were not enough index options available on the market to support his split-strike conversion strategy.  By some accounts, Madoff' strategy would have required at least ten times the S&P 100 option contracts that actually were traded on United States exchanges.

265.     In addition, even if there had been an adequate supply of options to support Madoff's purported strategy, the level of options trades this strategy required would have

had a significant impact on the market.  No such impact materialized because Madoff, in fact, was not utilizing the strategy.

266.     Once again, Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to detect these indicia of criminality and/or gross irregularities in Madoff's operations or chose to ignore them.

### 5.     BMIS's Retention of Custody Over Investor Assets

267.     Yet another red flag was Madoff's retention of custody over client assets at BMIS.  Well established industry custom and practice dictated that those client assets should have been held by an independent institutional custodian.

268.     The absence of a third party custodian in Madoff's operation was highly suspect.  With BMIS acting as both investment adviser and custodian, no independent third party was available to verify the value -- or even the existence -- of the securities Madoff claimed to have purchased and held for investors.

269.     Although such a clear departure from industry standards signaled something could be amiss in Madoff's operations, Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to detect this indication of criminality and/or gross irregularities in Madoff's operations or chose to ignore it.

### 6.     BMIS Acted As Its Own Broker-Dealer

270.     Similarly, Madoff's election to have BMIS act as its own broker-dealer was both inconsistent with industry standards and highly suspicious.

271.     With BMIS acting as its own broker-dealer, Madoff was in a position to fabricate trading tickets and related documents so as to reflect trades that actually did not occur.

Madoff would not have had this option if an independent broker-dealer was involved in his operations.

272.     Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to detect this indication of criminality and/or gross irregularities in Madoff's operations or chose to ignore them.

### 7.     BMIS's Documentation Was Highly Suspect

273.     The documentation that Madoff generated for investors was on its face highly suspicious and constituted yet another recklessly overlooked or ignored red flag.  Among other things, the formatting and general appearance of this documentation was dated and not consistent with modern practices.

274.     In addition, the documentation provided scant detail regard Madoff's activities and no transparency with respect to the nature of BMIS's operations.

275.     Moreover, Madoff did not permit clients to access their investment information online.  Instead, at all times he retained control over the hard copy documentation provided to investors.  Paper documentation enabled Madoff to manufacture the trade tickets that confirm investment results and falsify supporting documentation.

276.     The trading activity reflected on the account statements Madoff issued typically could not be squared with actual trading prices on the dates that activity was said to have incurred.

277.     Madoff's account statements also reflected a suspiciously consistent pattern of securities purchases at or close to daily lows and securities sales at or close to daily highs -- an enviable but virtually impossible pattern to repeat consistently over extended periods of time as Madoff claimed to have done.

54

278.     Further, the customer account statements BMIS issued could not be reconciled with reports BMIS filed with the SEC.  BMIS's stock holdings as reflected in the SEC filings were relatively modest and could not be reconciled with the magnitude of assets Madoff claimed to be managing.

279.     Despite being paid handsomely to vet and monitor the investment managers to which they channeled client assets, Tremont Group and its predecessors, along with Tremont Partners, either failed to detect these indicia of criminality and/or gross irregularities in Madoff's operations or chose to ignore them.

### 8.     Madoff's Unorthodox Fee Structure

280.     The fee arrangement Madoff was willing to enter into with the Rye Funds marked another clear break from industry custom and practice.  Although fantastically lucrative for Tremont Group and its predecessors, along with Tremont Partners, this arrangement was yet another signal of criminality and/or gross irregularities at BMIS.

281.     Notwithstanding the fact that Madoff was the manager whose expertise purportedly produced the exceptional returns investors had come to expect through the Rye Funds, Madoff did not draw his consideration from performance-based fees.

282.     Shunning such potentially rich fees, Madoff instead claimed to draw his consideration through brokerage commissions on the trades he allegedly placed as part of his purported split-strike conversion strategy.  Such an arrangement not only could encourage churning and other trading abuses, but it signaled that Madoff could be compensating himself through some other improper means -- which, of course, he had been for years.

283.     Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to detect this indication of criminality and/or gross irregularities in Madoff's operations or chose to ignore it.

### 9.     BMIS Was a Family Affair

284.     The fact that members of Madoff's immediate and extended family monopolized critical positions at BMIS was still another ignored or overlooked red flag.

285.     Madoff's brother, Peter Madoff, served as a senior managing director and the certified chief compliance officer at BMIS.

286.     Shana Swanson, Peter Madoff's daughter and Bernard Madoff's niece, served as BMIS's compliance counsel.  In this position, Swanson was responsible for giving legal advice on questions of BMIS's compliance with securities laws and regulations.

287.     Mark and Andrew Madoff, Bernard Madoff's sons, jointly ran BMIS's trading desk.

288.     Charles Weiner, Bernard Madoff's nephew, served as BMIS's director of administration.

289.     Madoff himself, of course, had overall control of BMIS's operations.

290.     The concentration of core responsibilities at BMIS in Madoff's family members marked yet another glaring departure from industry custom and practices.  Rather than operate BMIS as the $17 billion operation he claimed it to be, Madoff staffed his company like a small mom-and-pop operation.

291.     Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to detect this indication of criminality and/or gross irregularities in Madoff's operations or chose to ignore it.

### 10.     BMIS's Comptroller
###         Was Based in Bermuda

292.     Finally, in another sharp departure with industry practice, BMIS's comptroller was based not in BMIS's Manhattan offices but in Bermuda.

293.     Most investment operations of BMIS's purported size have an in-house comptroller position.  Madoff's departure from industry standards with respect to this important position was yet another red flag that BMIS's operations warranted close scrutiny.

294.     Tremont Group and its predecessors, along with Tremont Partners, either recklessly failed to detect this indication of potential irregularities in Madoff's operations or chose to ignore it.

**M.     Other Sophisticated Entities Spotted Trouble
At BMIS and Steered Clear of Madoff**

295.     Notwithstanding the defendants' failure to detect or refusal to acknowledge these red flags, entities with far more limited access to or influence over Madoff determined long before Madoff's arrest that BMIS's operations were highly suspect.

296.     For example, as early as 2000, Harry Markopolos, a self-styled independent fraud examiner, was reporting improprieties in Madoff's operation to the SEC.

297.     In 2005, Markopolos submitted to the SEC a memorandum regarding Madoff's operations entitled, "The World's Largest Hedge Fund is a Fraud."  Therein, Markopolos outlined no fewer than 29 red flags pointing to highly suspicious practices in Madoff's operations.

298.     In his 2005 submission to the SEC, Markopolos wrote, "I am pretty confident [BMIS] is a Ponzi Scheme[.]"  Markopolos added, "There are too many red flags to ignore."

299.     In a December 13, 2008 article in The Wall Street Journal, Markopolos was quoted as saying of these red flags:

> There were multiple smoking guns of various
> calibers.  People were willfully blinded to the
> problems, because they wanted to believe in his
> returns.

300.     Not everyone, however, was blind to Madoff's scheme.  For example, Credit Suisse Group AG in 2000 urged its customers to steer clear of Madoff and withdraw whatever assets they may have placed with him.  It issued this advice after meeting with Madoff and coming away with no answers to such fundamental questions as how much money Madoff managed, why BMIS utilized a little-known auditing firm and why Madoff served as the custodian of his clients' assets, according to an article published on January 8, 2009 by Bloomberg.com.

301.     In 2003, a team of investment bankers from Societe Generale performed due diligence on Madoff's operations.  Detecting a number of red flags, the large French bank placed Madoff on an internal blacklist and prohibited its investment bankers from doing any business with him.  In a December 17, 2008 article in the International Herald-Tribune, one of Societe Generale's investment bankers was quoted as stating that the red flags were so obvious that the bank "didn't hesitate" to place Madoff off limits.

302.     Aksia LLC, a hedge fund adviser, looked closely at BMIS in 2007 and detected "a host of red flags[.]"  In a client letter issued on the day of Madoff's arrest, Aksia wrote of its decision not to recommend feeder funds investing with Madoff:

> Our decision … [was based on] a host of red flags,
> which taken together made us concerned about the
> safety of client assets . . . . Our judgment was swift
> given the existence of red flags.

303.     In an e-mail to investors the day after Madoff was arrested, hedge fund Acorn Advisory Capital, L.P. advised that it had considered investing in a "Madoff managed account" but quickly decided against it.  Citing at least five red flags it detected during the course of its due diligence into Madoff's operations, the fund stated:

> Taken together, there were not merely warning
> lights, but a smoking gun.  The only plausible

58

> explanation we could conceived was that the
> account statements and trade confirmations were
> not bona fide but were generated as part of some
> sort of fraudulent or improper activity.

304.     Acorn Partners, a hedge fund adviser, also inquired into BMIS and

concluded quickly that Madoff's operations were not legitimate.  Robert Rosenkrantz, a principal

with the firm, was quoted in The New York Times on December 13, 2008 as stating:

> Our due diligence, which got into both account
> statements of [Madoff's] customers and the audited
> statements of Madoff Securities, which he filed with
> the SEC, made it seem highly likely that the account
> statements themselves were just pieces of paper that
> were generated in connection with some sort of
> fraudulent activity.

305.     On December 22, 2008, Pension & Investment quoted an executive at a

large fund-of-funds as stating that there were "a thousand red flags, if you did the work" of

delving into Madoff's operations.  This executive stated:

> It didn't take much energy to reverse-engineer
> Madoff's track record and find that his split-strike
> conversion method would not have worked in
> certain markets the way he said it did.

306.     Another hedge fund industry executive quoted in the Pension &

Investment article was dismissive of the near-legendary status Madoff enjoyed prior to his fall

from grace.  "Among serious people in the industry," the executive stated, "Madoff was a joke."

307.     Jim Vos, Aksia's chief executive officer, was quoted in the Pension &

Investments article as stating that, given the "host of red flags," his firm detected with respect to

Madoff, "[E]very time we were asked by clients, we waved them away from the Madoff feeder

funds."

308.     The list of investment firms that were not blind to Madoff's deception is

extensive.  Sophisticated entities such as Goldman Sachs, UBS, Black Rock, Inc. and BNY

Mellon Bank among many others all concluded that dealing with Madoff was ill-advised -- and they did so long before his Ponzi scheme imploded in December 2008.

309.    In 2006, for example, Merrill Lynch Investment Management analyzed Madoff's operations and concluded that his operations were suspect.  "We had a red light on doing business with him," Fabio Salvodelli, former chief investment officer with Merrill Lynch Investment Management was quoted as stating in a January 5, 2009 Financial Times article. "There was no transparency."

### N.    The Red Flags Could Not Have Been Missed Had Tremont Performed the Due Diligence It Claimed to Perform

310.    Despite the abundant red flags and the growing ranks of sophisticated investors who were on to Madoff's scam years before his Ponzi scheme imploded, the defendants claim they knew nothing of Madoff's scheme.

311.    Instead, Tremont Group claims to have been victimized by Madoff's scheme.  "This fraud claimed thousands of victims, Tremont among them," a Tremont spokesman stated shortly after Madoff was arrested.  "It was designed and executed to deceive individuals and institutions alike."

312.    In a letter to clients shortly after Madoff's arrest, Rye Investment Management stated, "Needless to say, our level of anger and dismay over the apparent betrayal by Mr. Madoff and his organization of his 14-year relationship with Tremont is immeasurable."

313.    The fact of the matter, however, is that Tremont Group, its predecessors and Tremont Partners must have detected the red flags regarding criminality and/or gross irregularities in Madoff's operations had they followed to any degree the due diligence and monitoring processes they claimed to employ on behalf of their clients.

314.     Prior to Madoff's arrest, Tremont Group and its predecessors, along with

Tremont Partners, claimed to have conducted exhaustive due diligence regarding all aspects of

the Rye Funds' operations, investments and management.  In the Form 10KSB it filed with the

SEC on or about May 7, 2001, for example, Tremont Advisers stated:

> Tremont's single-manager funds offer access to
> managers who have undergone review by the
> Company's research department and investment
> committee.  The Company sponsors only the funds
> of those managers it believes to be the "best in
> class[.]"

315.     Exacting due diligence on behalf of its clients was at the core of the

marketing pitch by Tremont Group and its predecessors.  On its website, Tremont stated:

> Effective investment strategies and oversight,
> thorough manager research, careful due diligence,
> advanced risk allocation and time-tested portfolio
> management form the cornerstone of a
> comprehensive platform that has been refined over
> a 23-year span of dedicated strides to maximize our
> clients' objectives.

316.     In its Uniform Application for Investment Adviser Registration dated

March 31, 2006, Tremont Partners detailed what it claimed was its due diligence process with

respect to its funds, including the Rye Funds.  Therein, Tremont Partners stated:

> Fund accounts are monitored in terms of securities
> holdings, asset mix and adherence to investment
> guidelines.  Tremont uses its own proprietary
> software programs to monitor the performance of
> investment managers.

317.     Tremont Partners also claimed to employ "a data base of over 6,000

management firms to evaluate investment process, approach and investment results."

318.     With respect to recommending and selecting investment managers,

Tremont Partners stated that its staff:

> [E]valuates investment management organizations.
> The staff analyzes, in detail, the philosophy, styles,
> strategies, investment professionals, decision-
> making processes and performance of the
> organization and the investment products offered.
> [Tremont Partners'] research staff conducts on-site
> interviews at and examination of such organizations
> to evaluate back office operations and internal staff,
> among other things.

319.     Further, Tremont Partners claimed that as part of its due diligence and

monitoring process, it:

> [U]tilizes data bases, wire services, performance
> measurement publications and other surveys of
> investment results, such as newspaper, and other
> business journals or information sources.

320.     Under the circumstances and given their long history of dealings with

Madoff, it is clear that Tremont Group and its predecessors, as well as Tremont Partners, either

recklessly chose not to conduct the due diligence of Madoff's operations they were paid

handsomely to conduct; engaged in recklessly ineffective due diligence; or were aware of or had

strong suspicions regarding Madoff's scam as a result of their due diligence and monitoring

processes and simply looked the other way.

321.     Similarly, through the due diligence conducted in 2001 in connection

with the Tremont Advisers acquisition and by other means, including their direct knowledge and

corporate control over the Tremont entities, MassMutual, MassMutual Holding, OAC and

OppenheimerFunds all either knew of the criminality and/or gross irregularities in Madoff's

operation or had well developed suspicions of such irregularities.

322.     Notwithstanding their expertise, sophistication, knowledge of

irregularities at BMIS or considerable suspicions that BMIS's operations were highly irregular,

none of these defendants took any action to protect the investments of these plaintiffs and the

class that were funneled and lost to Madoff's Ponzi scheme.  To the contrary, they stood idly by, reaping enormous fees while Madoff plundered the assets funneled to him through the Rye Funds.

> ### O.    **The Auditors' Roles**
>
> #### 1.    **E&Y**

323.    Defendant E&Y served as the auditor of one or more of the Rye Funds through August 1, 2006.

324.    One of the "Big Four" auditing firms, E&Y's website describes the company's auditors as ready to "address the most complex issues, using a proven global methodology and deploying the latest, high quality auditing tools and perspectives."  E&Y also identifies important features of its audit approach as follows:

> (a)    "Our early identification of business and control vulnerabilities and opportunities makes it possible for us to focus our audit effort on those areas of greatest risk."
>
> (b)    "Our risk-based audit approach focuses not only on financial statement related processes but also on business drivers, the associated risks, and the potential effects on financial statement accounts."
>
> (c)    "Ernst & Young's independence standards are among the strictest in the profession and always have been, and extend beyond those required by the U.S. SEC and professional standards."

325.    E&Y provided professional auditing services to the Rye Funds, including the preparation of audits at least annually, for which it accepted substantial fees.

326.    E&Y was aware, or reasonably should have been aware, that investors were relying on it to investigate and confirm that investments in the Rye Funds were accurately reported.  The limited partners in the Rye Funds were the intended beneficiaries of E&Y's work.

## 2.    KPMG

327.    Tremont changed auditors from KPMG in response to the wishes of Tremont's parent, MassMutual, and its affiliate OppenheimerFunds.

328.    KPMG has been an auditor of the Rye Funds since as early as 2004, and it has a long-term relationship with MassMutual and its affiliate OppenheimerFunds, Inc.

329.    KPMG is the United States member firm of KPMG International, a Swiss Cooperative that is also one of the "Big Four" auditing firms.  KPMG's website describes the company's auditors as being equipped with a high level of technical skill and empowered with professional skepticism.

330.    KPMG appears to have had certain professional relationships with Madoff and BMIS.  Among other things, KPMG International provided audit services to Madoff Securities International Ltd (a London affiliate to BMIS).

331.    KPMG provided professional auditing services to the Rye Funds, for which KPMG accepted substantial fees.  KPMG prepared audits at least annually.

332.    KPMG was aware, or reasonably should have been aware, that investors were relying on it to investigate and confirm that investments in the Rye Funds were accurately reported.  The limited partners in the Rye Funds were the intended beneficiaries of KPMG's work.

**3.    The Auditors' Failures
Facilitated Madoff's Ponzi Scheme**

333.    E&Y and KPMG each had a professional and fiduciary duty to audit the Rye Funds in accordance with GAAS.

334.    Several of the core professional auditing standards are defined by the Auditing Standards Board ("ASB").  The ASB is the senior technical body of the American Institute of Certified Public Accountants ("AICPA").

335.    The ASB codifies Statements on Auditing Standards (SASs) and related auditing interpretations applicable to the preparation and issuance of audit reports.  The codified sections on auditing standards are abbreviated as "AU" sections.

336.    These Auditing Standards apply to audits of all nonissuer entities.  The ASB issues pronouncements on auditing matters applicable to the preparation and issuance of audit reports.

337.    Rule 202 of the AICPA Code of Professional Conduct requires an AICPA member who performs an audit (the auditor) of the financial statements of a nonissuer -- like KPMG in this case -- to comply with standards promulgated by the ASB.

338.    AU §110.02 provides in pertinent part:

> The auditor has a responsibility to plan and perform
> the audit to obtain reasonable assurance about
> whether the financial statements are free of material
> misstatement, whether caused by error or fraud.
> Because of the nature of audit evidence and the
> characteristics of fraud, the auditor is able to obtain
> reasonable, but not absolute, assurance that material
> misstatements are detected.

339.    The general standards of professional care under GAAS include (among other standards) the following principles:

(a)     In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

(b)     Due professional care is to be exercised in the performance of the audit and the preparation of the report.

(c)     Sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

(d)     Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

(AU§150.02)

340.    To comply with GAAS, the auditor has to perform specific auditing procedures and determine whether anything would lead him or her to believe that the financial statements were not fairly presented in accordance with GAAP.

341.    Pursuant to AU §312.12:

The auditor should consider audit risk and materiality both in (a) planning the audit and designing auditing procedures and (b) evaluating whether the financial statements taken as a whole are presented fairly, in all material respects, in conformity with generally accepted accounting principles. The auditor should consider audit risk and materiality in the first circumstance to obtain sufficient competent evidential matter on which to properly evaluate the financial statements in the second circumstance.

342.    Among other professional responsibilities, the auditor must exercise independence and professional skepticism and not accept "less-than-persuasive" evidence.

66

343.     GAAS requires that auditors exercise due professional care in planning and performing an audit and in preparing the audit report.  (AU § 230.01)

344.     Due professional care requires that the auditor exercise professional skepticism in performing audit procedures and gathering and analyzing audit evidence. (AU §§ 230.07-.08)

345.     "Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."  (AU § 230.07; see also AU §§ 316.13, 333.02)

346.     As AU §316.13 states:

> Due professional care requires the auditor to exercise professional skepticism. See section 230, Due Professional Care in the Performance of Work, paragraphs .07 through .09. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. **In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest**.

AU §316.13 (emphasis added).

347.     The risk assessment process should "be ongoing throughout the audit" and should consider whether the "nature of audit procedures performed may need to be changed

to obtain evidence that is more reliable or to obtain additional corroborative information." (AU §§ 316.52, 316.68).  "For example, more evidential matter may be needed from independent sources outside the entity . . . ." (AU § 316.52)

348.   Auditors should be alert to risk factors that include (among many other factors):

(a)   Whether the audited entity experienced unusual profitability compared to its competitors;

(b)   Whether the financials for the entity were derived from reports that were difficult to corroborate;

(c)   Whether the business activities of the entity involved highly complex transactions;

(d)   Whether the entity was ineffectively monitoring the persons who controlled its assets;

(e)   Whether any single person (or small group) dominated management of the entity's assets;

(f)   Whether the entity lacked adequate safeguards over its assets;

(g)   Whether the entity timely reconciled its investments; and

(h)   Whether there were known claims lodged against management for securities or similar violations.

(AU § 316.85 (Appendix))

349.   Auditors need to obtain sufficient competent evidence "to afford a reasonable basis for an opinion regarding the financial statements under audit." (AU § 326.01) The validity and sufficiency of required evidence depends on the circumstances and the auditors'

68

judgment, but the evidence should be competent, sufficient, and persuasive. (AU §§ 326.02,

326.21, 326.22).

      350.     Pursuant to AU §326A.25:

> In evaluating evidential matter, the auditor
> considers whether specific audit objectives have
> been achieved.  The independent auditor should be
> thorough in his or her search for evidential matter
> and unbiased in its evaluation. In designing audit
> procedures to obtain competent evidential matter,
> he or she should recognize the possibility that the
> financial statements may not be fairly presented in
> conformity with generally accepted accounting
> principles or a comprehensive basis of accounting
> other than generally accepted accounting principles.
> In developing his or her opinion, the auditor should
> consider relevant evidential matter regardless of
> whether it appears to corroborate or to contradict
> the assertions in the financial statements. To the
> extent the auditor remains in substantial doubt about
> any assertion of material significance, he or she
> must refrain from forming an opinion until he or she
> has obtained sufficient competent evidential matter
> to remove such substantial doubt, or the auditor
> must express a qualified opinion or a disclaimer of
> opinion. [Footnotes omitted]

      351.     AU § 332 provides specific guidance to auditors in planning and

performing auditing procedures for assertions about derivative instruments, hedging activities,

and investments in securities that are made in an entity's financial statements.  (AU §332.01)

      352.     Pursuant to AU §332.28:

> For valuations based on an investee's financial
> results, including but not limited to the equity
> method of accounting, the auditor should obtain
> sufficient appropriate audit evidence in support of
> the investee's financial results. The auditor should
> read available financial statements of the investee
> and the accompanying audit report, if any. Financial
> statements of the investee that have been audited by
> an auditor whose report is satisfactory, for this

> purpose, to the investor's auditor may constitute
> sufficient evidential matter.

353.    The auditor should conduct a critical assessment of the reports of other

auditors:

> In determining whether the report of another auditor
> is satisfactory for this purpose, the auditor may
> consider performing procedures such as making
> inquiries as to the professional reputation and
> standing of the other auditor, visiting the other
> auditor and discussing the audit procedures
> followed and the results thereof, and reviewing the
> audit program and/or working papers of the other
> auditor.

(AU §332.28, fn. 14)

354.    AU §332.29 provides that the need for further audit evidence depends in

part on the materiality of the investment to the investor's financial position or results of

operation:

> If in the auditor's judgment additional audit
> evidence is needed, the auditor should perform
> procedures to gather such evidence. For example,
> the auditor may conclude that additional audit
> evidence is needed because of significant
> differences in fiscal year-ends, significant
> differences in accounting principles, changes in
> ownership, changes in conditions affecting the use
> of the equity method, or the materiality of the
> investment to the investor's financial position or
> results of operations. Examples of procedures the
> auditor may perform are reviewing information in
> the investor's files that relates to the investee such
> as investee minutes and budgets and cash flows
> information about the investee and making inquiries
> of investor management about the investee's
> financial results.

355.    Pursuant to AU §332.30:

> if the investee's financial statements are not audited,
> or if the investee auditor's report is not satisfactory

> to the investor's auditor for this purpose, the
> investor's auditor should apply, or should request
> that the investor arrange with the investee to have
> another auditor apply, appropriate auditing
> procedures to such financial statements, considering
> the materiality of the investment in relation to the
> financial statements of the investor.

356.     The AICPA has published a Practice Aid for Auditors, Alternative

Investments-Audit Considerations.  The AICPA Practice Aid explicitly covers "hedge funds"

within the meaning of "alternative investments."  The Practice Aid counsels:

> Alternative investments can present challenges with
> respect to obtaining sufficient appropriate audit
> evidence in support of the existence and valuation
> assertions, because of the lack of a readily
> determinable fair value for these investments and
> the limited investment information generally
> provided by fund managers.

(AICPA Practice Aid, at p. 1)

357.     The Practice Aid further states:

> The auditor's risk assessment depends on the
> particular facts and circumstances, including (1) the
> significance of alternative investments to the
> financial statements; (2) the nature, complexity, and
> liquidity of the underlying investments; (3) the
> nature and extent of management's process and
> related internal controls associated with valuation of
> alternative investments; and (4) the nature and
> extent of information available to management to
> support its valuation process and valuation
> conclusions.

(Id., at p. 2)

358.     The AICPA Practice Aid explains that:

> [I]n circumstances in which the auditor determines
> that the nature and extent of audit procedures should
> include verifying the existence of alternative
> investments, simply confirming investments in the
> aggregate does not constitute adequate audit

71

> evidence. . . .[D]epending on the significance of the alternative investments to the investor entity's financial statements taken as a whole, even if the fund manager confirms all requested information, it may be necessary for the auditor to perform additional audit procedures.

(Id., at p. 3)

359.    In addition, the AICPA Practice Aid explains:

> Confirm the alternative investment.  The Interpretation states that if the auditor determines that the nature and extent of auditing procedures should include testing the measurement of the investor entity's investment, simply receiving a confirmation from the alternative investment of its investments in securities, either in aggregate or on a security-by-security basis, does not, in and of itself, constitute adequate audit evidence with respect to the valuation assertion.  The extent of the additional audit procedures is directly related to the assessed risk of material misstatement of the financial statements.

(Id. at p. 10)

360.    E&Y and KPMG each assumed the following professional responsibilities in connection with its audit of the Rye Funds (among others):

(a)    Exercising due professional care;

(b)    Planning and performing audit procedures, and conducting due diligence in auditing the reported financial results for the Rye Broad Market Funds;

(c)    Exercising professional skepticism;

(d)    Assessing Tremont's internal controls and audit risks;

(e)    Independently examining and assess the evidence in support of the financial results reported by Tremont;

> (f) Expanding its audit procedures (e.g., testing and verification of the valuation of assets) in light of the many red flags and risk factors described herein;
>
> (g) Ensuring that its individual auditors properly discharge their special and critical gate keeping duties;
>
> (h) Confirming Tremont's compliance with GAAP; and
>
> (i) Complying with GAAS.

361.    In light of the red flags and risk factors described herein, proper auditing procedures required a thorough due diligence investigation of Madoff and BMIS.  This is particularly true in light of the facts that there was no independent verification of Madoff's investments and that the BMIS auditor was objectively unqualified for the magnitude of the BMIS audit.

362.    E&Y and KPMG each breached its professional duties and violated GAAS in a number of ways:

> (a) The auditors failed to use due professional care in conducting audits of the Rye Funds;
>
> (b) The auditors failed to adequately plan its audit in order to reasonably detect the existence of errors or irregularities;
>
> (c) The auditors failed to conduct proper due diligence and failed to investigate the numerous red flags with respect to the financial condition of assets invested in the Rye Funds;
>
> (d) The auditors failed to exercise professional skepticism in conducting its audit of the Rye Funds;
>
> (e) The auditors failed to adequately assess Tremont's internal controls and audit risks;

(f)     The auditors failed to obtain sufficient
        competent evidence in support of the values
        that Tremont ascribed to the Rye Funds, and
        failed to adequately and independently test,
        examine and assess the limited evidence
        made available to it by Tremont;

(g)     The auditors failed to expand its audit
        procedures or perform effective audit testing
        to obtain more reliable, persuasive audit
        evidence.  These failures are striking in light
        of the red flags and risk factors discussed
        herein, the huge sums of money that
        Tremont invested with BMIS, the
        percentage of the Rye Funds assets given to
        Madoff and BMIS, the obvious unsuitability
        and inexperience of the purported auditor for
        BMIS (Friehling & Horowitz), and the
        critical fact that BMIS did not have an
        independent custodian;

(h)     The auditors failed to adequately confirm
        the existence of the Rye Funds assets
        purportedly maintained at BMIS;

(i)     The auditors failed to reconcile the actual
        cash flows with Madoff's purported trading
        activities and bank account balances;

(j)     The auditors failed to adequately analyze
        and confirm the truthfulness of the footnotes
        of the audits, which are a material part of the
        audit, especially the claimed activities which
        purportedly generated and gave legitimacy
        to the "Net realized gains" in the Statement
        of Operations;

(k)     The auditors failed to question and analyze
        the inconsistency between the footnotes on
        "Organization" and "Derivative Financial
        Instruments" which describe on a complex
        trading strategy of the fund, but at the time
        of the audit all assets consist of US Treasury
        Bills; and

(l)     The auditors failed to perform its auditing
        work in conformity with GAAS.

363.     In addition, the auditors failed to properly evaluate the risks posed by the numerous red flags associated with investments given to Madoff and BMIS.  Independent audits should have flagged the excessive risks associated with the Rye Funds for reasons such as the following:

(a)     The funds were reporting unusual profitability compared to other hedge funds;

(b)     The financials were based on reports that were difficult to corroborate;

(c)     The business activities involved highly complex transactions;

(d)     Tremont did not adequately monitor Madoff's purported trading activities;

(e)     Madoff single-handedly dominated management of the funds;

(f)     Tremont did not have adequate safeguards in place with respect to fund assets;

(g)     Madoff reported trades using paper trade confirmations sent by mail, without providing any form of electronic real-time access; even though Madoff's firm pioneered electronic screen-based trading in the 1970s and 1980s and claimed that it used the most advanced technology. This practice made it possible for Madoff to manufacture trade tickets reflecting near-perfect market timing;

(h)     Madoff consistently converted all holdings to Treasuries at the end of each quarter, a practice that, in light of Madoff's claim that his strategy depended on entering and exiting the market when the conditions were likely to render his strategy profitable, had no legitimate purpose other than to reduce transparency;

75

(i)      Madoff's accounting firm was not a firm that could reasonably be relied upon to provide a proper audit:

      (i)      It was a small, unknown and unrecognized accounting firm in Rockland County occupying a 13' by 18' office n a strip mall;

      (ii)      It employed only two professionals of which only one was active; -- a 78-yearold living in Florida and a 47-year-old accountant whose wife worked for Madoff;

      (iii)      It was not registered with the Public Company Accounting Oversight Board (PCAOB);

      (iv)      It did no participate in New York state's peer review program for auditors; and

      (v)      It informed the AICPA that it did not do audits, and therefore the AICPA did not require it to undergo a state peer review audit.

(j)      Under the Investment Advisers Act, investment advisers are required to maintain client funds or securities with a "qualified custodian." who is independent.  Madoff was self-clearing, that is, that he initiated and executed all trades and had custody of the securities he purchased, a failure to segregate responsibilities that increased the risk of fraud;

(k)      There were untimely reconciliations of trading, assets, and cash flows; and

(l)      There were known claims lodged against Madoff for SEC violations.

364.    Each auditor also failed to confirm the existence of the securities and to heed the red flags noted above.

365.     Had each auditor competently performed its auditing services in accordance with GAAS, it would have uncovered critical discrepancies in the Rye Funds' accounts, activities, and financial statements.

366.     Instead, E&Y and KPMG each failed to uncover that virtually all of the capital invested in the Rye Funds was being used by Madoff and BMIS in a massive Ponzi scheme.

**P.     BNY's Role**

367.     BNY acted as the fund administrator for one or more of the Rye Funds. It provided professional fund administration, valuation and custodial services to the Rye Funds for which it is believed to have accepted substantial fees.

368.     These professional services purportedly included monthly calculation of the Net Asset Value for certain Rye Funds, independent portfolio monitoring, accounting and account reconciliation, coordination of audits, asset management, reconciliation of trading activities, and fulfillment of reporting requirements.

369.     One of the main goals of outsourced hedge fund administration is to increase the transparency of investments for fund investors.  BNY failed to competently administer the Rye Broad Funds and failed to exercise due care so as to verify the fund investments and avoid unnecessary investment risks.

370.     BNY, through BNY Alternative, entered into service agreements to provide services with the Rye Funds to provide administration, valuation, and custodial services, including monthly calculation of the Net Asset Value of certain Rye Funds.  This required BNY to conduct independent determinations of the funds' assets and liabilities.

371.     One of the primary objectives of selecting BNY to administer the funds was to provide a quality accounting and tailored administrative services.

372.    As a "qualified custodian," BNY was required to deliver the account statements directly to advisory clients as opposed to going through the adviser. The direct delivery method was designed to ensure integrity of the account statement information as well as allow the advisory client to easily identify any unauthorized transactions or withdrawals by an adviser.

373.    BNY was responsible for performing certain day-to-day administration tasks on behalf of the Rye Funds, including:

(a)    calculating daily or periodic portfolio valuations using independent pricing sources,

(b)    reconciling cash and portfolio positions,

(c)    providing electronic interface with prime brokers and custodians,

(d)    processing corporate actions,

(e)    providing portfolio reporting,

(f)    maintaining books and records,

(g)    calculating all fund fees (performance and asset based),

(h)    reconciling general ledger accounts,

(i)    calculating and disseminating daily or periodic net asset values,

(j)    preparing periodic financial statements,

(k)    coordinating annual audits,

(l)    communicating with limited partners,

(m)    communicating with others relating to the Rye Funds,

(n)    processing subscriptions of new limited partners,

78

       (o)     maintaining the registers of limited partners,

       (p)     disbursing distributions with respect to the interests, legal fees, accounting fees, and officers' fees, and

       (q)     conducting meetings of limited partners and the General Partner.

374.    In addition, BNY was responsible for providing certain custodial services to the Rye Funds.

375.    As the professional administrator for the Rye Funds, BNY was in a position such that it independently should have monitored and valued the Rye Funds' holdings, reconciled the Rye Fund accounts, trading activities and financial statements.

376.    Madoff funneled monies from his investment advisory business into an account with BNY, which account was also maintained as an operating account for the BMIS trading business.  BNY's strong financial relationship with Madoff incentivized BNY not to question the legitimacy of Madoff's activities.

377.    Notably, BNY has a large asset management unit that chose to steer clear of investing with Madoff.

378.    BNY breached its professional duties to the Rye Funds and their investors in a number of ways:

       (a)     BNY failed to use due professional care in conducting custodial services and determining the existence of assets held for the benefit of the Rye and its partners; and

       (b)     As the Rye Funds' administrator and custodian, BNY missed the fact that virtually all of the capital invested in the Rye Funds was being used in a massive Ponzi scheme.

379.     In addition, BNY failed to properly evaluate the numerous red flags associated with investments given to Madoff and BMIS.  Professional administrative and custodial services should have questioned and investigated the true existence of assets given the following:

(a)     The existence of assets were based on reports that were difficult to corroborate and easy to fabricate. For instance, Madoff reported trades using paper trade confirmations sent to investors by mail, without providing any form of electronic real-time access, even though Madoff's firm pioneered electronic screen-based trading in the 1970s and 1980s and claimed that it used the most advanced technology. This practice made it possible for Madoff to manufacture trade tickets reflecting near-perfect market timing;

(b)     Madoff consistently converted all holdings to Treasuries at the end of each quarter, a practice that, in light of Madoff's claim that his strategy depended on entering and exiting the market when the conditions were likely to render his strategy profitable, had no legitimate purpose other than to reduce transparency;

(c)     Madoff's accounting firm was a small, unknown accounting firm in Rockland County occupying a 13' by 18' office and employing only two professionals--a 78-yearold living in Florida and a 47-year-old accountant whose wife worked for Madoff--rather than a recognized audit firm.

(d)     Madoff was self-clearing, that is, that he initiated and executed all trades and had custody of the securities he purchased, a failure to segregate responsibilities that increased the risk of fraud; and

(e)     There were untimely reconciliations of trading, assets, and cash flows.

380.     Had BNY competently performed its services, it would have identified

critical discrepancies in the Rye Fund accounts, activities, and financial statements.

**Q.     SSC's Role**

381.     Defendant SS&C Technologies, through its subsidiary division SS&C

Fund Services, acted as the independent asset valuer and/or fund administrator for one or more of

the Rye Funds.  SS&C held itself out as follows and as providing the following services for the

Rye Funds:

> Recognized as the source for independent fund
> accounting and administration for hedge funds, fund
> of funds and private equity. Because we do not
> compete with our clients or are owned by an
> investment bank, you know, and your investors
> know, that outsourcing your technology risk to
> SS&C also eliminates your exposure to financial
> risk.
>
> We are more than just a service provider, we are a
> trusted partner. Our highly experienced and
> accredited staff has the ability to handle your most
> complex investments. Our comprehensive middle
> and back office platform and SAS 70 Type II
> certification provide the infrastructure, controls and
> procedures so you don't have to.  Safeguard against
> conflicts of interest with SS&C. Our sole focus is
> your fund and its shareholders.
>
> Are you looking for a Fund Administrator? SS&C
> Fund Services is a leading independent fund
> administration provider in excess of $140 billion in
> Assets under Administration (AUA).
>
> SS&C Fund Services -- Unique Strengths
>
> -   Ability to independently value all security
>     types including derivatives
>
> -   Highly experienced and knowledgeable staff
>
> -   300+ Fund Accounting Professionals
>
> -   10 years+ average industry experience

- 85 CPA's and Advanced Degrees

- Daily middle and back-office services focus

- Strong and scalable processing infrastructure and systems

- Many notable Hedge Fund clients (strong references) with a broad exposure to range of security types, strategies and fund structures

- Comprehensive Transfer Agency services for On-shore and Offshore funds

- Multiple processing centers with physical expansion capabilities and ability to recruit qualified staff

- Ownership and control of the underlying technology

Experience with fund migrations as well as fund launches

382.    SS&C provided professional fund administration, valuation, and/or custodial services to one or more of the Rye Funds, for which SS&C is believed to have accepted substantial fees.  These professional services purportedly included monthly calculation of the Net Asset Value, independent portfolio monitoring, and reconciliation of trading activities;

383.    SS&C was required to receive actual electronic trade information from Madoff related to the trading by the relevant Rye Fund's brokerage account, from which it could value the trades and calculate the returns to the funds.

384.    SS&C purportedly acted as an independent third party service provider that would calculate, process, and verify the returns.  In particular, SS&C purportedly reviewed each of the trades and related prices to ensure that the investment adviser did not deviate from the relevant fund's stated investment strategy.

82

385.    SS&C failed to competently administer the pertinent Rye Funds and failed to exercise due care so as to verify the fund investments and avoid unnecessary investment risks.

386.    SS&C agreed to act as an independent third party service provider that would calculate, process, and verify the fund's returns.  SS&C was responsible for reviewing the purported trades and related prices to ensure that Madoff actually purchased baskets of stocks and options consistent with a split-strike conversion investment strategy.  This required SS&C to conduct independent determinations as to the fund's assets and Madoff's purported trading activities.

387.    As the professional administrator for one or more of the Rye Broad Market Funds, SS&C undertook to monitor and value the Rye Broad Market Fund holdings, tracked reports of fund performance against benchmarks, implemented appropriate risk management measures, and reconciled the Rye Broad Market Fund accounts, trading activities, and financial statements.  Furthermore, SS&C undertook to safeguard the relevant fund(s) against Madoff's conflicts of interest as both the broker and investment adviser.

388.    SS&C negligently and recklessly missed the fact that virtually all of the capital invested in the Rye Broad Market Funds was being used by Madoff in a massive Ponzi scheme.

389.    Had SS&C competently performed its services, it would have identified critical discrepancies in the accounts, activities, and financial statements for the Rye Broad Market Fund(s) under its administration.

R.      **Role of the Sub-Feeder Funds**

390.     In addition to an extensive network of feeder funds like the Rye Funds, Madoff's Ponzi scheme was fed by a legion of so called sub-feeder funds that channeled funds to the feeder funds, which, in turn, then routed those funds to Madoff.

1.      **FutureSelect Prime**

391.     Nominal Defendant FutureSelect Prime was one such sub-feeder fund through which substantial funds flowed to Madoff.

392.     Future Select Prime is managed by defendant FPM.  FPM was responsible for managing FutureSelect Prime's investment portfolio.  FPM was paid annual management fees of at least 1.5% of FutureSelect Prime's net assets.

393.     FPM invested substantially all of FutureSelect Prime's capital in the Rye Funds.  As a result, the net asset value dropped from about $3,143.00 per unit on September 30, 2008, to 0.00 (zero) per unit following news of the Madoff scandal, as reported to members of FutureSelect Prime on December 30, 2008.

394.     FPM failed to perform proper due diligence and failed to use professional care in managing FutureSelect Prime.  Among other things, it failed:

> (a)     to perform due diligence as to Madoff's investment activities;
>
> (b)     to investigate each of the various red flags with regard to Madoff's use of plaintiffs' capital;
>
> (c)     to independently verify Madoff's financial statements;
>
> (d)     to monitor the ongoing risks associated with Madoff's use of plaintiffs' capital; and
>
> (e)     to safeguard plaintiffs' investments from excessive risks of loss.

84

395.     Plaintiff John Dennis invested in Future Select Prime.  This investment now appears to have been wiped out as a r result of the activities alleged herein.

### 2.     **Austin Safe Harbor Fund**

396.     The Austin Safe Harbor Fund was another sub-feeder fund that fed into Madoff's scheme.

397.     Defendant Austin is an investment management firm and a fiduciary to employee retirement benefit plans, including the Laborers Pension Plan.  Austin is the investment manager of the Safe Harbor Fund.

398.     Through its General Partner, ACM GP Corp., Austin invested most or all of the Safe Harbor Fund through the Austin Safe Harbor Master Account, G.P., a Texas General Partnership, utilizing a master/feeder structure. Austin is also the investment manager of the Austin Master Account.

399.     For its professional services, Austin claimed management fees equal to 1.5% of the annual net asset value of the Austin Safe Harbor Fund.  Austin has acknowledged that it is a fiduciary under ERISA with respect to each benefit plan investor that holds shares in the Austin Safe Harbor Fund.

400.     Austin, through ACM GP Corp., invested part of the Safe Harbor Fund's capital in the Rye Funds.

401.     Austin is a fiduciary of the Laborers Pension Plan within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21), in that:

> (a)     it exercises discretionary authority or control over a portion of the Plan's assets for the purpose of investment;

> (b)     it is an investment manager within the meaning of Section 3(38) of ERISA, 29 U.S.C. § 1002(38); and

      (c)     it executed an agreement expressly
               recognizing its status as a fiduciary under
               ERISA.

402.      As an ERISA fiduciary, Austin had a duty to prudently manage the Plan's assets for the sole and exclusive interest of the participants and beneficiaries, in accordance with Section 404(a) of ERISA, 29 U.S.C. §1104(a).

403.      Austin and ACM-GP were also responsible for managing and supervising all investments in the Austin Safe Harbor Fund and Austin Safe Harbor Master Account.

404.      The Laborers Pension Plan invested capital in the Austin Safe Harbor Fund, for which Austin is the named investment manager.

405.      Using its master/feeder structure, Austin invested a portion of the Austin Safe Harbor Fund and Austin Master Account assets into the Rye Funds.

406.      As of 2008, Austin had approximately $2.3 billion under management for all of its clients.

407.      On or about December 16, 2008, Austin revealed that it had invested part of its assets in hedge funds that were controlled by Madoff.

408.      Austin and ACM GP Corp. failed to adequately investigate or conduct a complete and proper due diligence.  They also failed to evaluate evidence showing that any investment in the Rye Funds would be risky, imprudent and inappropriate.

409.      Austin should have determined from the available evidence that investments in the Rye Funds were inconsistent with the high duty of prudence required of fiduciaries and investment managers under ERISA.

410.      Defendants Austin and ACM-GP also failed:

      (a)    to perform due diligence as to Madoff's
investment activities;

      (b)    to investigate each of the various red flags
with regard to Madoff's use of plaintiffs'
capital;

      (c)    to independently verify Madoff's financial
statements;

      (d)    to monitor the ongoing risks associated with
Madoff's use of plaintiffs' capital; and

      (e)    to safeguard plaintiffs' investments from
excessive risks of loss.

**3.**    **Spectrum Select**

411.    Nominal Defendant Spectrum Select was a third sub-feeder fund that
pumped funds into Madoff's schemes.

412.    Defendant SSP is Spectrum's general partner and investment manager.

413.    Defendant SSP was responsible for managing and supervising
Spectrum's investments in the Rye Broad Market Funds.  SSP invested substantially all of
Spectrum's capital in the Rye Broad Market Funds.  As a result, limited partnership interests in
Spectrum currently have a net asset value of zero.

414.    SSP was paid management fees based upon the value of limited partners'
capital accounts, plus incentive allocations based on capital appreciation.

415.    SSP failed to perform proper due diligence and failed to use professional
care in managing Spectrum Select.  Among other things, it:

      (a)    to perform due diligence as to Madoff's
investment activities;

      (b)    to investigate each of the various red flags
with regard to Madoff's use of plaintiffs'
capital;

(c)    to independently verify Madoff's financial statements;

(d)    to monitor the ongoing risks associated with Madoff's use of plaintiffs' capital; and

(e)    to safeguard plaintiffs' investments from excessive risks of loss.

416.    Plaintiff Peshkin invested in Spectrum Select.  That investment appears to have been wiped out as a result of the activities alleged herein.

## V.    CLASS ACTION ALLEGATIONS

417.    Class Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the class consisting of all investors in the Rye Funds who had not redeemed their interests in those funds as of December 11, 2008 (the "Class").  Excluded from the Class are the defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants, BMIS, Madoff and any other members of the Madoff family.

418.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members remains unknown at this time, Class Plaintiffs believe that there are hundreds of members of the proposed Class.

419.    Class Plaintiffs' claims are typical of the other members of the proposed Class in that Plaintiffs and the other Class members invested in the Rye Funds and maintained their investments in the Rye Funds as a result of the advice of certain of the defendants who owed fiduciary duties.  Class Plaintiffs and other Class members sustained damages due to the same breaches of fiduciary duties owed to the Class by other defendants whose wrongful acts and/or omissions were breaches of fiduciary duty.

420.     Class Plaintiffs will fairly and adequately protect the interests of the

Class and have retained counsel that is competent and experienced in class action and

shareholder litigation.

421.     A class action is superior to other methods for the fair and efficient

adjudication of the Class claims herein asserted.  Moreover, the questions of law and fact

common to the Class predominate over questions, if any, relating to individual Class members.

Common questions of law and fact include, but are not limited to the following:

     a.    Whether Tremont Group and its predecessors, Tremont Partners and Hodges owed fiduciary duties to Class Plaintiffs and the Class;

     b.    Whether Tremont Group and its predecessors, Tremont Partners and Hodges breached their fiduciary duties to Class Plaintiffs and the Class;

     c.    Whether MassMutual, MassMutual Holding, OAC and Oppenheimer Funds aided and abetted the breaches of fiduciary duties by Tremont Group and its predecessors, Tremont Partners and Hodges;

     d.    Whether MassMutual, MassMutual Holding, OAC, OppenheimerFunds and Tremont Group were unjustly enriched;

     e.    Whether Tremont Group and Tremont Partners breached their contractual obligations to the Class Plaintiffs and the Class; and,

     f.    Whether and the extent to which Class Plaintiffs and the Class suffered damages as a result of the defendants' wrongdoing.

## VI.   ADDITIONAL DERIVATIVE ACTION ALLEGATIONS

422.   Plaintiff Peshkin is a limited partner of Nominal Defendant Spectrum, which is a limited partner of the Market Fund, Prime Fund, and/or XL Fund.

423.   Plaintiff Dennis is a limited partner of Nominal Defendant FutureSelect Prime, which is a limited partner of the Market Fund, Prime Fund, and/or XL Fund.

424.   Plaintiff Laborers Pension Plan is a limited partner of Nominal Defendants Austin Safe Harbor Fund and Austin Safe Harbor Master Account, the latter of which is a limited partner of the Market Fund, Prime Fund, and/or XL Fund.

425.   Plaintiffs Peshkin, Dennis, Eastham Capital, Laborers Pension Plan, and NPV Positive Corp. bring this action derivatively for the benefit of the Nominal Defendants to redress the injuries suffered by the Nominal Defendants as a result of the alleged misconduct. Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LP, and Rye Select Broad Market XL Fund LP, Rye Select Broad Market Portfolio Fund LP, Rye Select Broad Market XL Portfolio Fund LP, FutureSelect Prime, Austin Safe Harbor Fund and Austin Safe Harbor Master Account, and Spectrum are named as Nominal Defendants solely in a derivative capacity.

426.   Plaintiff Peshkin asserts that: (a) is and was a limited partner of record in Spectrum at the time of transactions of which he now complains, and on December 11, 2008; and (b) Spectrum is and was a partner of record in Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LP, and/or Rye Select Broad Market XL Fund LP at the time of transactions of which Plaintiff Peshkin now complains, and on December 11, 2008.

427.   Plaintiff Dennis asserts that: (a) he is and was a limited partner of record in FutureSelect Prime at the time of transactions of which he now complains, and on December 11, 2008; and (b) FutureSelect Prime is and was a partner of record in Rye Select Broad Market

Fund LP, Rye Select Broad Market Prime Fund LP, and/or Rye Select Broad Market XL Fund

LP at the time of transactions of which Plaintiff now complains, and on December 11, 2008.

428.    Plaintiff Laborers Pension Plan asserts that:

(a)    it is and was a limited partner of record in
Austin Safe Harbor Fund and Austin Safe
Harbor Master Account at the time of
transactions of which it now complains, and
on December 11, 2008; and

(b)    the Austin Safe Harbor Fund and/or Austin
Safe Harbor Master Account were partners
of record in Rye Select Broad Market Fund
LP, Rye Select Broad Market Prime Fund
LP, and/or Rye Select Broad Market XL
Fund LP at the time of transactions of which
Plaintiff now complains, and on December
11, 2008.

429.    Plaintiff Eastham Capital asserts that it is and was a partner of record in

Rye Select Broad Market Prime Fund LP at the time of transactions of which Plaintiff now

complains, and on December 11, 2008.

430.    Plaintiff NPV Positive Corp. asserts that it is and was a partner of record

in Rye Select Broad Market Portfolio Ltd at the time of transactions of which Plaintiff now

complains, and on December 11, 2008.

431.    This action is not a collusive one to confer jurisdiction that the court

would otherwise lack.

432.    Plaintiffs Peshkin, Dennis, Laborers Pension Plan, Eastham Capital, and

NPV Positive Corp., have not made efforts to have the general partners or investment managers

of Nominal Defendants bring suit based on the claims asserted herein.  Plaintiffs have not made

such efforts for the following reasons:

(a)      Demand upon the general partners and/or investment managers of the Nominal Defendants to bring an action on behalf of the investment funds asserting the claims herein would be futile.  The general partners and/or investment managers are actually or potentially liable to Plaintiffs and the Nominal Defendants for the alleged misconduct described herein;

(b)      Defendants SSP, FPM, and Austin cannot be expected to prosecute claims against themselves, and it would be a useless act to demand that they do so.  Indeed, despite catastrophic losses being revealed on or about December 11, 2008, Defendants have not asserted any legal claims against themselves;

(c)      The unlawful acts and practices alleged herein cannot be effectively defended by Defendants, who face substantial exposure to liabilities and suffer from irreconcilable conflicts of interest;

(d)      In addition, Defendants may have additional conflicts of interest due to the uncertain tax consequences of litigating as a named plaintiff, and due to acceptance of fees derived from Madoff's ill-gotten gains;

(e)      Demand upon the General Partners or Investment Managers of the Nominal Defendant Rye Broad Market Funds (i.e., Tremont) to bring an action on their behalf asserting the claims herein would be futile.  Tremont is actually or potentially liable for the alleged misconduct described herein;

(f)      Tremont cannot be expected to prosecute claims against itself.  It would be a useless act to demand that Tremont bring suit against itself on behalf of the Rye Broad Market Funds.  And in fact, Tremont has not asserted any legal claims related to the loss of the Rye Broad Market Funds' capital;

(g)     The unlawful acts and practices alleged herein cannot be effectively defended by Tremont while it faces substantial exposure to liabilities.  Tremont thereby suffers from an irreconcilable conflict of interest; and

(h)     In addition, Tremont may have additional conflicts of interest due to the uncertain tax consequences of litigating as a named plaintiff, and due to its acceptance of fees derived from Madoff's ill-gotten gains.

## VII.   CAUSES OF ACTION

### COUNT I

**BREACH OF FIDUCIARY DUTY**
**(On Behalf of the Class and Against Tremont Partners,**
**Tremont Group, Schulman, Mitchell and Hodges)**

433.     Class Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 432, with the exception of allegations relating to the derivative claims, as if fully set forth herein.

434.     On behalf of the Class, Class Plaintiffs bring this Count against defendants Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges.

435.     Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges each owed fiduciary duties to Class Plaintiffs and other members of the Class who, in investing billions of dollars through the Rye Funds, reposed in Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges a high degree of confidence and trust and relied on their superior expertise in investment matters.

436.     Senior officers of Tremont Partners and Tremont Group, including Schulman, Mitchell and Hodges, stated that Tremont Partners and Tremont Group possessed the expertise and sophistication necessary either to select a competent and appropriate "single

93

manager" to whom investments in the Rye Funds would be channeled, or ensure that such a manager was selected.

437.     Senior officers of Tremont Partners and Tremont Group, including Schulman, Mitchell and Hodges, stated that Tremont Partners and Tremont Group possessed the expertise and sophistication necessary either to conduct appropriate due diligence of the "single manager" to whom investments in the Rye Funds would be channeled, or cause such due diligence to be conducted.

438.     Senior officers of Tremont Partners and Tremont Group, including Schulman, Mitchell and Hodges, stated that Tremont Partners and Tremont Group possessed the expertise and sophistication necessary either to adequately monitor on an ongoing basis the operations of the "single manager" to whom investments in the Rye Funds would be channeled, or cause such monitoring to be conducted.

439.     As fiduciaries, Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges were obligated to at all times act loyally, with reasonable care, in good faith and with diligence in order to best protect the interests of those who invested through the Rye Funds.

440.     Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges breached their fiduciary duties to Class Plaintiffs and the Class by recklessly selecting Madoff, or permitting Madoff to be selected, as the "single manager" to whom investments in the Rye Funds were entrusted.

441.     Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges breached their fiduciary duties to Class Plaintiffs and the other Class members by recklessly failing to either conduct or cause to be conducted adequate due diligence of Madoff's operations.

442.     In addition, Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges breached their fiduciary duties to Class Plaintiffs and the Class by recklessly overlooking or ignoring the numerous red flags signaling criminality and/or gross irregularities in Madoff's operations.

443.     Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges further breached their fiduciary duties to Class Plaintiffs and other members of the Class by recklessly failing to adequately monitor Madoff's operations, or failing to ensure Madoff's operations were properly monitored.

444.     Because Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges did not fulfill their fiduciary duties to Class Plaintiffs and the Class, Rye Fund investors were never alerted to the indicia of criminality and/or gross irregularities in Madoff's operations, never had a reasonable opportunity to withdraw their funds from Madoff's control before it was too late to do so, and eventually saw all or substantially all of the billions of dollars they invested through the Rye Funds decimated by Madoff's Ponzi scheme.

445.     The Class Plaintiffs and the other Class members incurred substantial damages as a direct and proximate result of the reckless and willful conduct of Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges in breaching their fiduciary duties.

## COUNT II

### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
### (On Behalf of the Class and Against MassMutual, MassMutual
### Holding, OAC and OppenheimerFunds)

446.     Class Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 445, with the exception of allegations relating to the derivative claims, as if fully set forth herein.

447.     On behalf of the Class, Class Plaintiffs bring this Count against defendants MassMutual, MassMutual Holding, OAC and OppenheimerFunds for aiding and abetting Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges' breaches of their fiduciary duties.

448.     MassMutual, MassMutual Holding, OAC and OppenheimerFunds each either knew of or recklessly disregarded the indicia of criminality and/or gross irregularities in Madoff's operations.

449.     Further, MassMutual, MassMutual Holding, OAC and OppenheimerFunds each knew that Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges either recklessly failed to conduct adequate due diligence into Madoff's operations and/or had failed to cause such due diligence to be conducted.

450.     In addition, MassMutual, MassMutual Holding, OAC, and OppenheimerFunds each knew that Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges either had recklessly failed to adequately monitor Madoff's operations and/or had failed to cause such monitoring to be conducted.

451.     Further, MassMutual, MassMutual Holding, OAC and OppenheimerFunds each knew that Tremont Group, Schulman, Mitchell and Hodges either knew of or were recklessly disregarding the indicia of criminality and/or gross irregularities in Madoff's operations.

452.     MassMutual, MassMutual Holding, OppenheimerFunds and Tremont Partners also knew that Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges recklessly had failed to take appropriate steps to protect the interests of investors in the Rye

Funds notwithstanding the indicia of criminality and/or gross irregularities in Madoff's operations.

453.    Thus, MassMutual, MassMutual Holding, OAC and OppenheimerFunds each knew of Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges' breaches of their fiduciary duties to Class Plaintiffs and other members of the Class as investors in the Rye Funds.

454.    MassMutual, MassMutual Holding, OAC and OppenheimerFunds knowingly induced and/or participated in and Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges' breaches of their fiduciary duties in order not to jeopardize the rich revenue stream and other financial benefits they had received and hoped to continue to receive as a result of the billions of dollars that had been invested through the Rye Funds.

455.    MassMutual, MassMutual Holding, OAC and OppenheimerFunds knowingly participated in Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges' breaches of fiduciary duty by providing substantial assistance to and Tremont Partners, Tremont Group and Hodges in their breaches of those fiduciary duties through, among other things, the joint marketing efforts the defendants engaged in with respect to the Rye Funds.

456.    MassMutual, MassMutual Holding, OAC and OppenheimerFunds provided further substantial assistance to and Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges by helping to conceal those breaches and by failing to act when required to do so in the face of those breaches.

457.    MassMutual, MassMutual Holding, OAC and OppenheimerFunds provided substantial assistance to Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges by providing Tremont Group with the ability to significantly expand Tremont Partners

97

and Tremont Group's reach and market their products through MassMutual Financial Group's extensive global distribution network.

458.    In addition, MassMutual, MassMutual Holding, OAC and OppenheimerFunds provided substantial assistance to and Tremont Partners, Tremont Group, Schulman, Mitchell and Hodges by permitting and Tremont Partners and Tremont Group to work alongside and with the imprimatur of such well established and trusted entities as OppenheimerFunds and MassMutual.

459.    Class Plaintiffs and the Class have suffered substantial damages as a direct and proximate result of the aforementioned breaches of fiduciary duties that MassMutual, MassMutual Holding, OAC and OppenheimerFunds aided and abetted through their respective acts and/or omissions.

## COUNT III

### UNJUST ENRICHMENT
### (On Behalf of the Class and Against MassMutual, MassMutual Holding, OAC, OppenheimerFunds and Tremont Group)

460.    Class Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 459, with the exception of allegations relating to the derivative claims, as if fully set forth herein.

461.    On behalf of the Class, Class Plaintiffs bring this Count against defendants MassMutual, MassMutual Holding, OAC and OppenheimerFunds and Tremont Group for unjust enrichment.

462.    Class Plaintiffs and the other members of the Class invested billions of dollars through the Rye Funds.

463.    Substantial fees were imposed upon and paid by Class Plaintiffs and the other members of the Class in connection with their investments through the Rye Funds.

98

464.     In return for these substantial fees, Class Plaintiffs and members of the Class reasonably expected that, among other things, the "single manager" to which investments in the Rye Funds were channeled had been properly vetted and would be continuously monitored.

465.     MassMutual, MassMutual Holding, OAC, OppenheimerFunds and Tremont Group each benefitted financially from, among other things, the substantial revenue stream generated by the fees imposed on the investments Class Plaintiffs and Class members' made through the Rye Funds.

466.     As is now apparent, Madoff -- the "single manager" to whom the investments in the Rye Funds were funneled -- was not adequately vetted nor were his operations adequately monitored.  As a result, Madoff was able to perpetrate his Ponzi scheme for years without detection and thus plunder all or virtually all of the assets invested through the Rye Funds.

467.     The hundreds of millions of dollars in fees paid by Class Plaintiffs and the Class on the investments made through the Rye Funds were wholly unjustified, unearned, unreasonable and unconscionable.

468.     MassMutual, MassMutual Holding, OAC, OppenheimerFunds and Tremont Group were unjustly enriched by their receipt of the substantial financial benefits flowing from the fees imposed upon and paid by Class Plaintiffs and the Class as investors in the Rye Funds.

469.     Under the circumstances set forth herein, equity and good conscience dictate that MassMutual, MassMutual Holding, OAC, OppenheimerFunds and Tremont Group should be compelled to disgorge and return in their entirety any and all financial benefits they

99

received as a result of the investments Class Plaintiffs and the Class made through the Rye Funds.

470.     Class Plaintiffs and the Class may not have adequate remedies at law against one or more of these defendants.

**COUNT IV**

**BREACH OF CONTRACT**
**(On Behalf of the Class and Against Tremont Group and Tremont Partners)**

471.     Class Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 470, with the exception of allegations relating to the derivative claims, as if fully set forth herein.

472.     On behalf of the Class, Class Plaintiffs bring this Count against defendants Tremont Group and Tremont Partners.

473.     Class Plaintiffs and the Class entered into contractual arrangements with Tremont Partners and Tremont Group by which those defendants obligated themselves to, among other things, closely vet and conduct adequate due diligence of the "single manager" to which funds invested in the Rye Funds were channeled.

474.     Tremont Partners and Tremont Group further obligated themselves to adequately monitor the operations of the "single manager" to which funds invested in the Rye Funds were channeled.

475.     Tremont Partners and Tremont Group received, directly or indirectly, adequate consideration for the services they were obligated to provide pursuant to said contractual arrangements.

476.     Plaintiffs and the Class performed all of their obligations to Tremont Partners and Tremont Group pursuant to these contractual arrangements.

100

477.     Tremont Partners and Tremont Group materially breached their contractual obligations to Class Plaintiffs and the Class by, among other things, failing to conduct adequate due diligence into Madoff's operations.

478.     Tremont Partners and Tremont Group further materially breached their contractual obligations to Class Plaintiffs and the Class by failing to adequately monitor Madoff's operations.

479.     Due in large part to Tremont Partners and Tremont Group's breach of their contractual obligations, Madoff was able to perpetrate his Ponzi scheme undetected for years and decimate the billions of dollars Class Plaintiffs and the Class invested through the Rye Funds.

480.     As a direct result of Tremont Partners and Tremont Group's material breach of their contractual obligations, Class Plaintiffs and the Class have sustained substantial monetary injury.

## COUNT V

**BREACH OF FIDUCIARY DUTY**
**(Derivatively As Against E&Y and KPMG)**

481.     Derivative Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 480 as if fully set forth herein.

482.     Derivative Plaintiffs assert these claims derivatively as limited partners or members of their respective funds (Nominal Defendants) and derivatively on behalf of those funds (Nominal Defendants) as limited partners of the Rye Funds.[1]  Alternatively, Derivative Plaintiffs assert these claims as class claims on behalf of the limited partners of the Rye Funds.

---

[1]   Plaintiff Peshkin is a member of Spectrum; Plaintiff Dennis is a member of FutureSelect Prime; Plaintiff Laborers Pension Plan is a shareholder of the Austin Safe Harbor Fund, Spectrum, FutureSelect Prime, and Austin Safe Harbor Fund and/or Austin Safe Harbor Master

483.    In exchange for substantial service fees, E&Y and KPMG each agreed to provide rigorous independent audits with respect to Tremont's financial reports.

484.    E&Y and KPMG each owed fiduciary duties to the Nominal Defendant Rye Funds to audit Tremont's financial reports diligently, prudently, independently, competently, and consistent with GAAS.

485.    In auditing the Rye Funds, E&Y and KPMG were responsible for using due professional care in planning and performing the audit, maintaining independence from management, assessing internal control and audit risks, obtaining sufficient competent evidential matter to support the audit, exercising professional skepticism and not accepting "less-than-persuasive" evidence, expanding its audit procedures in light of the many red flags and risk factors described herein, confirming Tremont's compliance with GAAP, and otherwise complying with GAAS.

486.    As a result of its auditing activities, E&Y and KPMG each should have discovered that Tremont's reported financial results were inconsistent with GAAP and that Tremont did not have sufficient evidence regarding capital under Madoff's control to support the audits.

487.    E&Y and KPMG breached their fiduciary duties by failing to use prudence in planning to audit, and in auditing, the Rye Funds; failing to conduct proper due diligence; failing to maintain independence from management; failing to investigate the numerous red flags and risk factors describe herein; failing to exercise professional skepticism in

---

Account are limited partners of the Rye Funds.  Plaintiffs assert these claims derivatively as limited partners or members of their respective funds, and then derivatively by those funds as limited partners of the Rye Funds.  Derivative claims of this sort are sometimes referred to as "double-derivative" claims.  Plaintiff Eastham Capital and Plaintiff NPV Positive Corp. are direct limited partners of Rye Funds, and in that capacity, they assert single derivative claims.

conducting the audits; failing to adequately evaluate Tremont's internal controls and audit risks; failing to obtain and evaluate sufficient competent evidence and confirmations to support the audits; failing to identify the excessive risks affecting funds under Madoff's control; failing to expand the audit procedures and failing to perform effective audit testing to obtain more reliable, persuasive audit evidence in light of the red flags and risk factors discussed herein; and otherwise violating GAAS.

488.    Defendants E&Y and KPMG each acted with negligence and/or gross negligence in breaching its fiduciary duties.

489.    As a direct and proximate result of the breach of fiduciary duties by these auditors, the Nominal Defendant Rye Funds lost all of their capital, and thereby suffered damages in an amount to be proven at trial.

## COUNT VI

### BREACH OF FIDUCIARY DUTY
### (Derivatively As Against BNY and SS&C)

490.    Derivative Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 489 as if fully set forth herein.

491.    Derivative Plaintiffs assert these claims derivatively as limited partners or members of their respective funds (Nominal Defendants) and derivatively on behalf of those funds (Nominal Defendants) as limited partners of the Rye Funds.  Alternatively, Derivative Plaintiffs assert these claims as class claims on behalf of the limited partners of the Rye Funds.

492.    Defendants BNY and SS&C provided administrative, custodial and or valuation services to the Nominal Defendant Rye Funds in exchange for substantial monthly fees.  The administration fees claimed by BNY and SS&C were based on the net assets of the Rye Funds.  The administrative responsibilities of BNY and SS&C included (without limitation):

independently valuing and reconciling the fund holdings, providing custodial services, and/or assisting with preparation of financial statements and audits.

493.    BNY and SS&C owed fiduciary duties to the Nominal Defendants to diligently, prudently, independently, and competently administer, and ascertain the existence and value of the assets held for the benefit of the Rye Funds.

494.    As a result of their positions as fund administrators, BNY and SS&C should have monitored, valued, and reconciled the Rye Funds holdings, trading activities, and accounts.

495.    BNY and SS&C each breached its fiduciary duties to the Nominal Defendants by, among other things:

> (a)    Failing to monitor and ascertain the existence of the Rye Funds holdings and trading activities;
>
> (b)    Failing to accurately and independently value the Rye Funds holdings;
>
> (c)    Failing to accurately and independently reconcile the Rye Funds accounts;
>
> (d)    Failing to provide the requisite custodial services;
>
> (e)    Failing to preserve the Rye Fund assets;
>
> (f)    Failing to assist with the preparation of meaningful financial statements and audits; and otherwise
>
> (g)    Missing a massive Ponzi scheme that covered virtually all of the capital invested in the Rye Funds.

496.    The BNY and SS&C Defendants acted with gross negligence in breaching their fiduciary duties.  As a direct and proximate result of their breaches of fiduciary duties, the

Nominal Defendant Rye Funds lost substantially all of its capital, and thereby suffered damages in an amount to be proven at trial.

## COUNT VII

**BREACH OF FIDUCIARY DUTY**
**(Derivatively As Against SSP, FP and Ward)**

497.     Derivative Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 496 as if fully set forth herein.

498.     Derivative Plaintiffs assert this claim derivatively on behalf of the Nominal Defendants Spectrum and FutureSelect Prime.  These Nominal Defendants entrusted substantial investment capital to Defendants SSP, FPM and Ward, who accepted substantial fees in the course of managing that capital.  Defendants therefore assumed and owed the following fiduciary duties (among others):

      (a)     The duty to competently and prudently conduct due diligence;

      (b)     The duty to competently and prudently select between investment opportunities;

      (c)     The duty to competently and prudently manage and monitor capital entrusted to the fiduciary; and

      (d)     The duty to competently and prudently safeguard capital entrusted to the fiduciary.

499.     Defendants SSP, FPM and Ward breached their fiduciary duties owed to the Nominal Defendants by, among other things:

      (a)     Failing to competently and prudently perform proper due diligence with respect to capital investments;

      (b)     Failing to competently and prudently select between investment opportunities, opting instead to give substantially all of the assets

under management to Tremont and
ultimately to Madoff and BMIS;

(c)    Failing to competently and prudently
manage Spectrum and FutureSelect Prime,
ignoring the red flags associated with funds
being given to Madoff and BMIS, and
abandoning oversight of the assets under
management; and

(d)    Failing to competently and prudently
safeguard the capital entrusted to them.

500.    These Defendants acted with gross negligence in breaching their fiduciary

duties.  As a direct and proximate result of these breaches of duty, Nominal Defendants lost

substantially all of their capital, and thereby suffered damages in an amount to be proven at trial.

## COUNT VIII

### BREACH OF FIDUCIARY DUTY
### (Derivatively As Against Tremont and Tremont Affiliates)

501.    Derivative Plaintiffs repeat and reallege each and every allegation set

forth above in paragraphs 1 through 500 as if fully set forth herein.

502.    Derivative Plaintiffs assert these claims derivatively as limited partners or

members of their respective funds (Nominal Defendants) and derivatively on behalf of those

funds (Nominal Defendants) as limited partners of the Rye Funds.

503.    Spectrum, FutureSelect Prime, and Austin Safe Harbor Fund and/or

Austin Safe Harbor Master Account entrusted substantial investment capital to Defendants

Tremont and the Tremont Affiliates by investing in the Rye Funds.  These Defendants accepted

substantial fees in connection with managing that capital.

504.    Defendants Tremont and the Tremont Affiliates therefore assumed and

owed the following fiduciary duties (among others):

(a)    The duty to competently and prudently conduct due diligence;

(b)    The duty to competently and prudently select between investment opportunities;

(c)    The duty to competently and prudently manage and monitor capital entrusted to the fiduciary; and

(d)    The duty to competently and prudently safeguard capital entrusted to the fiduciary.

505.    Defendants Tremont and the Tremont Affiliates breached their fiduciary duties owed to the Rye by, among other things:

(a)    Failing to competently and prudently perform proper due diligence with respect to investment of the Rye Funds' assets;

(b)    Failing to competently and prudently select between investment opportunities, opting instead to give substantially all of the Rye Funds' assets to Tremont and ultimately to Madoff;

(c)    Failing to competently and prudently manage the Rye Funds, ignoring the red flags associated with funds being given to Madoff, and abandoning oversight of the Rye Funds' assets; and

(d)    Failing to competently and prudently safeguard the capital entrusted to them.

506.    Tremont and the Tremont Affiliates acted with negligence and/or gross negligence in breaching their fiduciary duties.  As a direct and proximate result of these breaches of fiduciary duties, the Nominal Defendant Rye Funds lost substantially all of their capital, and thereby suffered damages in an amount to be proven at trial.

## COUNT IX

### MALPRACTICE AND PROFESSIONAL NEGLIGENCE
### (DERIVATIVELY AS AGAINST SSP, FPM AND WARD)

507.    Derivative Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 506 as if fully set forth herein.

508.    Derivative Plaintiffs assert these claims derivatively as limited partners or members of their respective funds (Nominal Defendants) and derivatively on behalf of those funds (Nominal Defendants) as limited partners of the Rye Funds.

509.    Defendants SSP, and FPM and Ward assumed responsibility for investing the assets of Spectrum and FutureSelect Prime respectively, and had a duty to exercise prudence and due professional care in doing so.

510.    These Defendants failed to exercise prudence and due professional care in managing, monitoring, and safeguarding the assets under their management.  They also failed to provide Spectrum and FutureSelect Prime with the advice and services to which these Nominal Defendants were entitled.

511.    Among other things, Defendants SSP, and FPM and Ward ignored the red flags associated with funds being given to Madoff and BMIS.   Defendants also failed to conduct proper due diligence and abandoned oversight of the assets under their management.

512.    As a direct and proximate result of the negligence and/or gross negligence committed by Defendants SSP, FPM and Ward, Nominal Defendants Spectrum and FutureSelect Prime lost substantially all of their respective capital investments, and thereby suffered damages in an amount to be proven at trial.

## COUNT X

### MALPRACTICE AND PROFESSIONAL NEGLIGENCE
### (Derivatively As Against Tremont and Tremont Affiliates)

513.    Derivative Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 512 as if fully set forth herein.

514.    Derivative Plaintiffs assert these claims derivatively as limited partners or members of their respective funds (Nominal Defendants) and derivatively on behalf of those funds (Nominal Defendants) as limited partners of the Rye Funds.

515.    Defendants Tremont and the Tremont Affiliates assumed responsibility for investing the assets of the Rye Funds, and had a duty to exercise prudence, professional competence, and due professional care in doing so.

516.    Defendants Tremont and the Tremont Affiliates failed to exercise prudence, professional competence, and due professional care in managing, monitoring, and safeguarding the Rye Funds' assets, and failed to provide the Rye Funds.

517.    Among other things, Defendants ignored the red flags associated with funds being given to Madoff and BMIS.  Furthermore, Defendants failed to conduct proper due diligence, failed to oversee the capital invested in the Rye Funds' assets, and failed to safeguard that capital from excessive risks of loss.

518.    As a direct and proximate result of the negligence and/or gross negligence committed by Defendants Tremont and the Tremont Affiliates, the Nominal Defendants lost substantially all of their capital, and thereby suffered damages in an amount to be proven at trial.

## COUNT XI

### MALPRACTICE AND PROFESSIONAL NEGLIGENCE
#### (Derivatively As Against E&Y and KPMG)

519.    Derivative Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 518 as if fully set forth herein.

520.    Derivative Plaintiffs assert these claims derivatively as limited partners or members of their respective funds (Nominal Defendants) and individually or derivatively on behalf of those funds (Nominal Defendants) as limited partners of the Rye Funds.

521.    Defendants E&Y and KPMG each assumed professional responsibility for independently auditing the Rye Funds financial reports, undertook to exercise its professional skill and talent on behalf of and/or for the benefit of the Rye Funds and its limited partners, and had a duty to exercise professional competence and due professional care in doing so.

522.    In auditing the Rye Funds, E&Y and KPMG each had a duty to use due professional care in planning and performing the audits, maintaining independence from management, assessing internal control and audit risks, obtaining sufficient competent evidential matter to support the audits, exercising professional skepticism and not accepting "less-than-persuasive" evidence, expanding its audit procedures in light of the many red flags and risk factors described herein, confirming Tremont's compliance with GAAP, and otherwise complying with GAAS.

523.    As a result of its auditing activities, E&Y and KPMG negligently and recklessly ignored the fact that Tremont's reported financial results were inconsistent with GAAP and that Tremont did not have sufficient evidence regarding capital under Madoff's control to support the audits.

110

524.     E&Y and KPMG each failed to exercise professional competence, due professional care, professional skepticism and independence in planning to audit, and in auditing, the Rye Funds.

525.     Furthermore, E&Y and KPMG each failed to conduct proper due diligence, failed to investigate the numerous red flags and risk factors described herein, failed to adequately evaluate Tremont's internal controls and audit risks, failed to obtain and evaluate sufficient competent evidence and confirmations to support the audits, and failed to identify the excessive risks affecting funds under Madoff's control.

526.     Further still, E&Y and KPMG each failed to expand its audit procedures and failed to perform effective audit testing to obtain more reliable, persuasive audit evidence in light of the apparent risks.

527.     As a direct and proximate result of the auditors' professional negligence and/or gross negligence, the Nominal Defendants lost all of their capital, and thereby suffered damages in an amount to be proven at trial.

## COUNT XII

### MALPRACTICE AND PROFESSIONAL NEGLIGENCE
### (Derivatively As Against Defendants BNY and SS&C)

528.     Derivative Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 527 as if fully set forth herein.

529.     Derivative Plaintiffs assert these claims derivatively as limited partners or members of their respective funds (Nominal Defendants) and individually or derivatively on behalf of those funds (Nominal Defendants) as limited partners of the Rye Funds.

530.     Defendants BNY and SS&C assumed professional responsibility for administering, performing custodial and valuation services for the Nominal Defendant Rye

Funds, and had a duty to exercise professional competence and due professional care in doing so. The administrative , custodial and valuation responsibilities of BNY and SS&C included (without limitation):  independently ascertaining the existence of the funds assets and valuing and reconciling the fund holdings, providing custodial services, assisting with preparation of financial statements and audits, and determining fund disbursements.

531.    As a result of its auditing activities, BNY and SS&C should have discovered that the assets for which they were performing valuation and custodial services, did not exist.

532.    By virtue of their positions as fund administrators, BNY and SS&C should have monitored, valued, and reconciled the Rye Funds holdings, trading activities, and accounts.

533.    With gross negligence, BNY and SS&C failed to use professional care  in administering the Rye Funds and failed to provide the Rye Funds with the advice and services to which they were entitled by, among other things:

> (a)    Failing to monitor the fund holdings and trading activities;
>
> (b)    Failing to accurately and independently value the fund holdings;
>
> (c)    Failing to accurately and independently reconcile the fund accounts;
>
> (d)    Failing to provide the requisite custodial services;
>
> (e)    Failing to preserve the Rye Broad Market fund assets;
>
> (f)    Failing to assist with the preparation of meaningful financial statements and audits; and otherwise; and

(g)     Missing a massive Ponzi scheme that
        covered virtually all of the capital invested
        in the Rye Broad Market Funds.

534.   As a direct and proximate result of the gross professional negligence of

BNY and SS&C, the Nominal Defendants lost substantially all of their capital, and thereby

suffered damages in an amount to be proven at trial.

## COUNT XIII

### UNJUST ENRICHMENT
### (Derivatively As Against Tremont)

535.   Derivative Plaintiffs repeat and reallege each and every allegation set

forth above in paragraphs 1 through 534 as if fully set forth herein.

536.   Derivative Plaintiffs assert these claims derivatively as limited partners or

members of their respective funds (Nominal Defendants) and derivatively on behalf of those

funds (Nominal Defendants) as limited partners of the Rye funds.

537.   Defendants Tremont and the Tremont Affiliates acted with negligence

and/or gross negligence in breaching their fiduciary duties and failing to exercise professional

competence and due professional care in managing the Nominal Defendants' capital.  As a result,

Defendants have received a monetary benefit from the Nominal Defendants in the form of

professional fees, which fees were unearned, unreasonable, unfair, and unlawful.

538.   Defendants are aware of their receipt of the above-described benefits.

539.   Tremont and the Tremont Affiliates received the above-described benefits

to the detriment of Plaintiffs and the Nominal Defendants.  Tremont and the Tremont Affiliates

continue to retain the above-described benefits.

540.   The Nominal Defendants were injured in that substantially all of their

capital was lost, and the professional value of the use thereof was lost.  They were further injured

because substantial investment management fees were taken from them for services that they did not duly receive.

541.    The wrongful acts alleged above were substantial and proximate causes of injuries to the Nominal Defendants, and as a result of the unjust enrichment, the Nominal Defendants have sustained injuries in an amount to be determined at trial.  The Nominal Defendants have no other adequate remedy at law for their unjust enrichment claim.

542.    Derivatively on behalf of the Nominal Defendants, Plaintiffs seek restitution and disgorgement of Defendants' enrichment benefits.

## COUNT XIV

### VIOLATION OF ERISA
### (As Against Austin and ACM GP Corp.)

543.    The preceding paragraphs 1 through 542 are realleged and incorporated by reference as if set forth fully herein.

544.    Section 404(a) of ERISA requires that a fiduciary to an employee benefit plan act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This and other fiduciary duties under ERISA are among the highest known to law.

545.    Defendants Austin and ACM GP Corp. are fiduciaries to the Laborers Pension Plan and the proposed class within the meaning of ERISA.   As such, these Defendants were required to prudently manage and invest the assets of the Austin Safe Harbor Fund.

546.    Defendants breached their fiduciary duties under ERISA by failing to conduct adequate due diligence and failing to recognize the red flags associated with Madoff-

related funds indicating that such funds were not a prudent investment for employee benefit plans and their participants and beneficiaries.

547. As a proximate result of the above-described conduct, Laborers Pension Plan and the proposed Class lost assets that were to be used for the sole and exclusive purpose of providing pension benefits to plan participants and beneficiaries, to the detriment of Plaintiff and the proposed subclass of employee benefit plan investors in the Austin Safe Harbor Fund. Thus, Defendants have acted in violation of Sections 404, 405 and 409 of ERISA, 29 U.S.C. §§ 1104, 1105 & 1109.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully demand judgment:

A. Determining that Counts I through IV of this action constitute a proper class action, and certifying Class Plaintiffs as representatives under Federal Rules of Civil Procedure 23.

B. Awarding compensatory damages against defendants in favor of plaintiffs and the Class against all defendants (other than the Nominal Defendants) for damages sustained as a result of defendants' wrongdoing together with interest thereon;

C. Awarding compensatory damages in favor of the named plaintiffs, derivatively for the Nominal Defendants, against all defendants (other than the Nominal Defendants), jointly and severally, for all damages sustained as a result of defendants' wrongdoing in an amount to be proven at trial, including any interest thereon;

D Awarding prejudgment interest;

E. Awarding punitive damages as appropriate;

F. Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including, but not limited, to disgorgement);

G.   Awarding plaintiffs and the Class their costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees and experts' fees; and

H.   Awarding such other and further relief as may be just and proper.

## IX.   **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  New York, New York
April 20, 2009

ENTWISTLE & CAPPUCCI LLP

_____
ANDREW J. ENTWISTLE
WILLIAM S. GYVES
STEPHEN D. OESTREICH
ROBERT N. CAPPUCCI
RICHARD W. GONNELLO
ROBERT M. TRAVISANO

280 Park Avenue
26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200

*Counsel For Plaintiffs Arthur E. Lange*
*Revocable Trust and Arthur C. Lange*

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
REED KATHREIN

715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (501) 725-3001
Admitted Pro Hac Vice

116

DAVID S. NALVEN (DN-2374)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, Massachusetts 02142-1531
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

LEE M. GORDON
HAGENS BERMAN SOBOL SHAPIRO LLP
700 South Flower St., Suite 2940
Los Angeles, California 90017-4101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Admitted Pro Hac Vice

*Counsel for Plaintiffs Eastham Capital Appreciation Fund
LP, NPV Positive Corp., John Dennis, Daniel Jackson,
Laborers Local Pension Plan 17 and Richard Peshkin*

*Co-Lead Counsel for Plaintiffs*

## VERIFICATION

I, RICHARD PESHKIN, hereby declare:

I am a named Plaintiff and prospective class representative in this action. I have read the "FIRST CONSOLIDATED AMENDED CLASS ACTION AND DERIVATIVE ACTION COMPLAINT" in this case, and know its contents. The matters stated in the complaint are true and correct to the best of my own knowledge as to my own affairs, and if sworn as a witness, I could and would testify thereto. As to all other matters, I am informed and believe them to be true based on the investigation of counsel and on public reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Verification was executed on the 17 day of April, 2009 in Boca Raton, Florida.

RICHARD PESHKIN

# VERIFICATION

I, MORIS FINVARB, hereby declare:

I am an authorized signatory on behalf of named Plaintiff and prospective class representative NPV POSITIVE CORP. in this action. I have read the "FIRST CONSOLIDATED AMENDED CLASS ACTION AND DERIVATIVE ACTION COMPLAINT" in this case, and know its contents. The matters stated in the complaint are true and correct to the best of my own knowledge as to my own affairs, and if sworn as a witness, I could and would testify thereto. As to all other matters, I am informed and believe them to be true based on the investigation of counsel and on public reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Verification was executed on the 20th day of April, 2009 in Cartagena, Colombia.

MORIS FINVARB

## VERIFICATION

I, JOHN DENNIS, hereby declare:

I am a named Plaintiff and prospective class representative in this action. I have read the "FIRST CONSOLIDATED AMENDED CLASS ACTION AND DERIVATIVE ACTION COMPLAINT" in this case, and know its contents. The matters stated in the complaint are true and correct to the best of my own knowledge as to my own affairs, and if sworn as a witness, I could and would testify thereto. As to all other matters, I am informed and believe them to be true based on the investigation of counsel and on public reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Verification was executed on the 18 day of April, 2009 in 11 ch. des Grandes Vignes, Founex, Switzerland.

JOHN DENNIS

## VERIFICATION

I, GABRIEL FENTON, hereby declare:

I am an authorized signatory on behalf of names Plaintiff and prospective class representative EASTHAM CAPITAL APPRECIATION FUND L.P. in this action.  I have read the "FIRST CONSOLIDATED AMENDED CLASS ACTION AND DERIVATIVE ACTION COMPLAINT" in this case, and know its contents.  The matters stated in the complaint are true and correct to the best of my own knowledge as to my own affairs, and if sworn as a witness, I could and would testify thereto.  As to all other matters, I am informed and believe them to be true based on the investigation of counsel and on public reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Verification was executed on the _17th_ day of April, 2009 in _Scottsdale_, Arizona.

_4·20·09_

GABRIEL FENTON